No. 82,080[1]

In the Matter of the Care and Treatment of MICHAEL T. CRANE, *Appellant.*

(7 P.3d 285)

Opinion filed July 14, 2000.

*John C. Donham,* of Overland Park, argued the cause and was on the brief for appellant.

*W. Scott Toth,* assistant district attorney, argued the cause, and *Paul J. Morrison,* district attorney, *Steven J. Obermeier,* assistant district attorney, and *Carla J. Stovall,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Michael T. Crane appeals from the district court's order committing him to custody under the Sexually Violent Predator Act, K.S.A. 59-29a01 *et seq.* (Act).

In *State v. Crane,* 260 Kan. 208, 918 P.2d 1256 (1996), this court affirmed Michael Crane's conviction of lewd and lascivious behavior for exposing himself to a tanning salon attendant on January 6, 1993. His convictions of attempted aggravated criminal sodomy, attempted rape, and kidnapping were reversed. They arose out of

---

[1] **REPORTER'S NOTE:** In a 7-2 decision, the United States Supreme Court vacated and remanded the Kansas Supreme Court decision. See *Kansas v. Crane,* 534 U.S. 407, 151 L. Ed. 2d 856, 122 S. Ct. 867 (2002).

an incident in a video store that took place approximately 30 minutes after the tanning salon incident.

The aggravated sexual battery conviction that supplied the prior conduct element of Crane's sexual predator determination arose out of the video store incident. In that instance, Crane waited until he was the only customer in a video store and then grabbed the clerk from behind. With his genitals exposed, he lifted and pushed her and squeezed her neck with his hands. Crane three times ordered her to perform oral sex and said he was going to rape her. The attack ended when Crane suddenly stopped and ran out of the store.

Although the kidnapping charge could not be renewed, other charges arising from this incident were refiled. Pursuant to a plea agreement, Crane pled guilty to one count of aggravated sexual battery, a class D felony.

The present action was initiated when the State filed a petition in the district court seeking to have Crane evaluated and adjudicated a sexually violent predator. At the commitment trial, the State presented evidence of Crane's inappropriate sexual behavior on several occasions as well as the testimony of mental health professionals.

Psychologist Douglas Hippe evaluated Crane in 1994 and reviewed the mental health records subsequently compiled for Crane. He concluded that Crane suffers from antisocial personality disorder. Of the seven criteria listed in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994) (DSM-IV) for antisocial personality disorder, Crane consistently exhibits six, in Hippe's view. Crane also suffers from exhibitionism, which is a separate disorder. According to Hippe, exhibitionism alone would not be a sufficient basis for finding that a person was a sexual predator. Crane, in his opinion, is a sexual predator due to his combination of antisocial personality disorder and exhibitionism. He cited the increasing frequency of incidents involving Crane, increasing intensity of the incidents, Crane's increasing disregard for the rights of others, and his increasing daring and aggressiveness.

Psychologist Robert Huerter tested and interviewed Crane in 1993 with regard to Crane's claiming to have been in a blackout state during the video store incident. He concluded that Crane had not experienced blackout.

Psychiatrist Leonardo Mabugat testified that Crane suffers from antisocial personality disorder, "a pervasive pattern of disregard for and violation of the rights of others," which usually starts in or around adolescence.

The victim of the video store incident testified that the prosecuting attorney had talked with her about the State's entering into a plea agreement with Crane. The victim had been upset because she did not think that Crane would be serving enough time.

At the commitment trial, the victim expressed her disappointment in the course Crane's prosecution had taken. The prosecutor drew out her dissatisfaction by asking, "So would it be fair to say that for a crime that this Court gave a 35-to-life sentence to Mr. Crane, he only served a little over four years?" And he followed up on her affirmative response with "[a]nd understandably you're very upset about how the system treated you in this case, right?" "Yes, very," she answered. The victim had been told by the State that the kidnapping charge could not be refiled against Crane on account of a technicality.

In this regard, the prosecutor had suggested to her that obtaining a guilty plea "was the best way to go in order to be able to go down the line" and use the option of the Act. The victim agreed to the plea bargain because she believed "it was the only way to make sure that it didn't end there." The victim testified, "I was not aware that there was an option of going to trial and going through this or agreeing to the plea and then using the Sexual Predator Act. As I was—as I understood, this was the only option, but if we can get a—some kind of a conviction, then we can use this option later down the road to make sure he stays off the street."

Crane raises several issues on appeal; however, the controlling issue is whether it is constitutionally permissible to commit Crane as a sexual predator absent a showing that he was unable to control his dangerous behavior. To answer that question, we must revisit *Kansas v. Hendricks*, 521 U.S. 346, 138 L. Ed. 2d 501, 117 S. Ct.

2072 (1997). The majority opinion, written by Justice Thomas, controls the result in this case. Crane contends that the trial court erred in ruling that the Supreme Court's holding in *Hendricks* does not require a showing of a volitional impairment that prevents him from controlling his dangerous behavior when the respondent's mental disorder is a personality disorder. In its journal entry of the various stages in this proceeding, the district court ruled on February 25, 1998:

"Respondent mixes legal and psychiatric terms. The Court finds the commission of a sexual crime and the existence of a mental abnormality or personality disorder which makes the person likely to engage in future predatory acts of violence are separate concepts and not interdependent upon one another in the sexually violent predator context. The Court denies Respondent's Motion for Summary judgment stating as a matter of law that Respondent misinterprets the holding of *Kansas v. Hendricks*, 117 S. Ct. 2072 (1997) by arguing the State must prove the existence of a mental disorder that so impairs the volitional control of Respondent as to render him unable to control his dangerous behavior. The Court holds the State must only prove the existence of a mental disorder that makes Respondent likely to reoffend."

On August 3, 1998, the district court held as a matter of law "that even though the State's expert witnesses might agree that Respondent's mental disorder does not impair his volitional control to the degree he cannot control his dangerous behavior, that K.S.A. 59-29a01 *et seq.* does not specify such a required element to be proven."

Accordingly, the jury was instructed that in order to establish that Crane is a sexually violent predator, the State had to prove (1) that Crane had been convicted of aggravated sexual battery and (2) that he "suffers from a mental abnormality or personality disorder which makes the respondent likely to engage in future predatory acts of sexual violence, if not confined in a secure facility." "Likely" was defined as "more probable to occur than not to occur." "Mental abnormality" was defined for the jury in accordance with K.S.A. 1999 Supp. 59-29a02(b) as a "condition affecting the emotional or volitional capacity which predisposes a person to commit sexually violent offenses in a degree constituting such person a menace to the health and safety of others." "Personality disorder" was defined

for the jury as a "condition recognized by the . . . [DSM IV], and includes antisocial personality disorder."

Crane argues that *Hendricks* states in clear, unambiguous language that the constitutionality of the commitment procedure created by the Act depends on its application being limited to persons who cannot control their dangerous behavior. He quotes a number of passages from the majority opinion in *Hendricks* that bear on the respondent's inability to control his or her conduct. There is no question that the majority opinion is replete with references to the commitment of persons who cannot control their own behavior. See, *e.g.*, 521 U.S. at 357, 358, 360, 362, and 364.

Hendricks admitted that he had repeatedly sexually abused children and that he was unable to control the urge to do so. 521 U.S. at 355, 360. On appeal from his commitment proceeding, this court invalidated the Act on the ground that it did not predicate commitment on a finding of mental illness, which was a requirement of substantive due process. *In re Care & Treatment of Hendricks*, 259 Kan. 246, 912 P.2d 129 (1996). The Supreme Court granted certiorari on the State's petition to consider the due process issue as well as on Hendricks's cross-petition to consider his federal ex post facto and double jeopardy claims. 521 U.S. at 350.

On the question of due process, the Supreme Court rejected this court's requiring a finding of mental illness in order to override an individual's constitutionally protected liberty interest. 521 U.S. at 356-60. The Supreme Court catalogued constitutionally permissible instances in which "States have in certain narrow circumstances provided for the forcible civil detainment of people who are *unable to control their behavior* and who thereby pose a danger to the public health and safety." (Emphasis added.) 521 U.S. at 357. The typical state statute's linking of a finding of dangerousness with an additional factor, such as mental illness, is noted, as is the Kansas Act's conformance to the pattern:

"These added statutory requirements serve to limit involuntary civil confinement to those *who suffer from a volitional impairment rendering them dangerous beyond their control.* The Kansas Act is plainly of a kind with these other civil commitment statutes: It requires a finding of future dangerousness, and then links that finding to the existence of a 'mental abnormality' or 'personality disorder'

that makes it *difficult, if not impossible, for the person to control his dangerous behavior.* Kan. Stat. Ann. § 59-29a02(b) (1994). The precommitment requirement of a 'mental abnormality' or 'personality disorder' is consistent with the requirements of these other statutes that we have upheld in that it narrows the class of persons eligible for confinement to *those who are unable to control their dangerousness.*" (Emphasis added.) 521 U.S. at 358.

The Supreme Court concluded:

"To the extent that the civil commitment statutes we have considered set forth criteria relating to *an individual's inability to control his dangerousness,* the Kansas Act sets forth comparable criteria and Hendricks' condition doubtless satisfies those criteria. . . . Hendricks even conceded that, when he becomes 'stressed out,' he cannot 'control the urge' to molest children. . . . *This admitted lack of volitional control, coupled with a prediction of future dangerousness, adequately distinguishes Hendricks from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings.* Hendricks' diagnosis as a pedophile, which qualifies as a 'mental abnormality' under the Act, thus plainly suffices for due process purposes." (Emphasis added.) 521 U.S. at 360.

Kansas' statutory scheme for commitment of sexually violent predators does not expressly prohibit confinement absent a finding of uncontrollable dangerousness. In fact, a fair reading of the statute gives the opposite impression.

The Act provides for commitment of persons determined to be sexually violent predators. A "sexually violent predator" is defined in the statute as "any person who has been convicted of or charged with a sexually violent offense and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in repeat acts of sexual violence." K.S.A. 1999 Supp. 59-29a02(a). "Mental abnormality" is defined as a "condition affecting the emotional or volitional capacity which predisposes the person to commit sexually violent offenses in a degree constituting such person a menace to the health and safety of others." K.S.A. 1999 Supp. 59-29a02(b). The phrase "likely to engage in repeat acts of sexual violence" "means the person's propensity to commit acts of sexual violence is of such a degree as to pose a menace to the health and safety of others." K.S.A. 1999 Supp. 59-29a02(c).

The legislature specified that a person subject to commitment, in addition to having some history of a sexual offense or offenses, must be likely to engage in future, dangerous sexual behavior on

account of a mental condition. With regard to the mental condition, the legislature provided that it could affect either emotional capacity or volitional capacity. Volitional capacity is the capacity to exercise choice or will; a condition affecting the capacity to exercise choice or will in this context would be one that adversely affected the capacity, thereby rendering the person unable to control his or her behavior. The legislature identified emotional capacity as an alternative faculty that could be affected by the condition. Logic would seem to dictate that the alternative to a capacity involving the exercise of will is one in which the exercise of will is not at issue. Thus, a condition affecting that faculty would not necessarily remove the person's ability to control his or her behavior. It seems, therefore, that the result of the legislature's identifying emotional capacity as well as volitional capacity in the definition of mental abnormality was to include a source of bad behavior other than inability to control behavior.

The legislature also provided an alternative to a mental abnormality and that is a personality disorder. However, there is no definition of personality disorder in the Act. Thus, there is no express requirement of a finding of inability to control behavior in a personality disorder. Nor is there anything implied by the absence of a definition of personality disorder that would inject the requirement.

There also is no pattern definition of personality disorder. The Notes on Use of PIK Crim. 3d 57.41 state that a pattern definition is not possible because there are too many conditions recognized by the American Psychiatric Association as constituting personality disorders. "Notwithstanding, the Committee does recommend that the trial judge fashion an appropriate definitional instruction based upon the specific diagnosis stated in the American Psychiatric Association manual." In the present case, the trial judge instructed the jury that "personality disorder" is a "condition recognized by the . . . [DSM IV], and includes antisocial personality disorder."

At trial, Dr. Mabugat testified for the State that Crane suffered from the mental abnormality of exhibitionism and from the personality disorder called antisocial personality disorder. With respect to antisocial personality disorder, Dr. Mabugat testified that

Crane displayed a pervasive pattern of disregard for and violation of the rights of others that included the following behavior:

failure to conform to social norms with respect to lawful behaviors as indicated by repeatedly performing acts that are grounds for arrest;
impulsivity or failure to plan ahead;
irritability and aggressiveness, as indicated by repeated physical fights or assaults."

Dr. Mabugat believed that Crane's behavior was a combination of willful and uncontrollable behavior. Thus, if a volitional impairment were required for commitment under the Act, there was evidence of some inability on Crane's part to control his behavior.

Crane argues that *Hendricks* requires a volitional impairment when the person's mental condition is a personality disorder rather than a mental abnormality. Stated more generally, Crane's understanding is that the Supreme Court read a volitional impairment requirement into the Act as a condition of its constitutionality. In contrast to this court's focus on the Act's constitutionality, the Supreme Court's opinion seems to be much more specific to application of the Act to Hendricks. The particular facts of Hendricks' case, including his conceding that he cannot control his urge to sexually molest children, was at the core of the Supreme Court's opinion.

Finally, Crane directs the court's attention to a concern expressed by Justice Kennedy in his concurring opinion. After stating that the Kansas Act as applied to Hendricks conformed to Supreme Court precedents, he cautioned that "if it were shown that mental abnormality is too imprecise a category to offer a solid basis for concluding that civil detention is justified, our precedents would not suffice to validate it." 521 U.S. at 373. Crane argues that antisocial personality disorder is too imprecise a basis for civil confinement. He notes that in a deposition, Dr. Mabugat estimated that probably more than 75% of prison inmates suffer from antisocial personality disorder.

In summary, the Supreme Court opinion in *Hendricks* does not seem to include consideration of willful behavior. The Act's defi-

nition of mental abnormality seems to include behavior that the respondent could control, and the Act is silent with regard to personality disorder. Crane's position is that the Supreme Court read a requirement of inability to control behavior into the Act in order to uphold its constitutionality. Thus, he argues that the Act cannot be applied to him in the absence of a finding that he was unable to control his behavior. We find merit in the defendant's argument.

A fair reading of the majority opinion in *Hendricks* leads us to the inescapable conclusion that commitment under the Act is unconstitutional absent a finding that the defendant cannot control his dangerous behavior. To conclude otherwise would require that we ignore the plain language of the majority opinion in *Hendricks.* Justice Thomas, speaking for the majority, stated that to be constitutional, a civil commitment must limit involuntary confinement to those "who suffer from a volitional impairment rendering them dangerous beyond their control." 521 U.S. at 358. He noted that the Kansas Act set forth criteria to make such a finding by linking future dangerousness to a "mental abnormality" or "personality disorder" that "makes it difficult, if not impossible," to control such behavior. 521 U.S. at 358. Hendricks met that criteria by being diagnosed as a pedophile as well as admitting that he could not control his urge to molest children.

However, in the present case, Crane suffers from a "personality disorder," which by definition does not include a volitional impairment. As noted, there was some evidence to that effect. Within the standard of proof beyond a reasonable doubt, however, such evidence does not seem adequate. K.S.A. 1999 Supp. 59-29a07(a). Its sufficiency is a question for the jury, which was not instructed to make a finding as to Crane's inability to control his behavior. Since we hold that such a finding is required, the failure to so instruct the jury was error and requires that we reverse and remand for a new trial.

Crane also argues that the State's application of the Act violates the constitutional prohibitions of ex post facto laws and double jeopardy. The element of inability to control behavior also figures in the Supreme Court's consideration of Hendricks' ex post facto and double jeopardy claims. There, it is a part of the reasoning that

supports the conclusion that the Kansas Act establishes civil rather than criminal proceedings. 521 U.S. at 360-69. Because the Ex Post Facto and Double Jeopardy Clauses pertain exclusively to penal statutes, the Supreme Court concluded that the Kansas Act "runs afoul" of neither. 521 U.S. at 371.

The Supreme Court's rationale regarding the nonpunitive nature of the Kansas Act was twofold. First, commitment under the Act does not implicate objectives of criminal punishment, such as deterrence. 521 U.S. at 361-62. In that regard, the Court stated: "Those persons committed under the Act are, by definition, suffering from a 'mental abnormality' or a 'personality disorder' that *prevents them from exercising adequate control over their behavior*. Such persons are therefore unlikely to be deterred by the threat of confinement." (Emphasis added.) 521 U.S. at 362-63. Second, contrary to Hendricks' contention, the indefinite duration of confinement under the Act is not evidence of the State's punitive intent. The indefinite duration of confinement was said instead to be linked to the indeterminate suitability for release. 521 U.S. at 363-64. In addition, the periodic reviews required by the Act of the person's condition demonstrated to the Court "that Kansas does not intend an individual committed pursuant to the Act to remain confined any longer than he suffers from a mental abnormality rendering him *unable to control his dangerousness*." (Emphasis added.) 521 U.S. at 364.

The Ex Post Facto Clause forbids inflicting punishment greater than that attached to the offense when it was committed. U.S. Const., Art. I, § 10; *State v. LaMunyon*, 259 Kan. 54, Syl. ¶ 5, 911 P.2d 151 (1996). Hendricks, like Crane, committed the sexual offenses in question before the Act became effective. The double jeopardy and ex post facto claims were rejected by the Supreme Court majority on the ground that the Act is nonpunitive. 521 U.S. at 369. As we have seen, Hendricks' admitted inability to control his behavior figured heavily in the Supreme Court's classifying the Act as nonpunitive. First, Hendricks and persons like him would not be deterred by the commitment proceeding because uncontrollable behavior is not deterrable. 521 U.S. at 362. Second, Hendricks and persons like him would be confined only as long as they

were unable to control their behavior. 521 U.S. at 364. Crane contends that this does not end the inquiry because the determination whether punishment is being imposed is factual so that it may vary from case to case. His view is supported by the dissenting opinion in *Hendricks* and, perhaps more importantly, by the concurring opinion of Justice Kennedy. With five justices agreeing that factual circumstances different from those of Hendricks might warrant independent consideration of an ex post facto claim, the question is open whether the trial court was justified in concluding that the Supreme Court had foreclosed further consideration of the issue.

Justice Kennedy, writing about the majority opinion, stated that it fully explains why an ex post facto challenge could not succeed with regard to Hendricks. He continued:

"All this, however, concerns Hendricks alone. My brief, further comment is to caution against dangers inherent when a civil confinement law is used in conjunction with the criminal process, whether or not the law is given retroactive application.

". . . As all Members of the Court seem to agree, . . . the power of the State to confine persons who, by reason of a mental disease or mental abnormality, constitute a real, continuing, and serious danger to society is well established. [Citation omitted.] Confinement of such individuals is permitted even if it is pursuant to a statute enacted after the crime has been committed and the offender has begun serving, or has all but completed serving, a penal sentence, provided there is no object or purpose to punish. [Citation omitted.] The Kansas law, with its attendant protections . . . is within this pattern and tradition of civil confinement. . . .

"Notwithstanding its civil attributes, the practical effect of the Kansas law may be to impose confinement for life. . . .

"A common response to this may be, 'A life term is exactly what the sentence should have been anyway,' or, in the words of a Kansas task force member, 'SO BE IT.' [Citation omitted.] The point, however, is not how long Hendricks and others like him should serve a criminal sentence. With his criminal record, after all, a life term may well have been the only sentence appropriate to protect society and vindicate the wrong. The concern instead is whether it is the criminal system or the civil system which should make the decision in the first place. *If the civil system is used simply to impose punishment after the State makes an improvident plea bargain on the criminal side, then it is not performing its proper function.* . . .

"On the record before us, the Kansas civil statute conforms to our precedents. If, however, civil confinement were to become a mechanism for retribution or general deterrence, or if it were shown that mental abnormality is too imprecise

a category to offer a solid basis for concluding that civil detention is justified, our precedents would not suffice to validate it." (Emphasis added.) 521 U.S. at 371-73.

Justice Kennedy's concerns seem to have anticipated the case now before this court. Crane's convictions of kidnapping, attempted aggravated sodomy, and attempted rape arising from an incident involving a video store clerk were reversed by this court. 260 Kan. 208. The State refiled charges of attempted aggravated sodomy and attempted rape. Then the State and Crane entered into an agreement that concluded the criminal matter with his entering a plea of guilty to the single offense of aggravated sexual battery. He pled guilty in August 1997, and his conditional release date was January 6, 1998. The victim's testimony at Crane's sexual predator trial revealed that the State told her of its intention to follow Crane's plea with a sexual predator petition in order to prolong his confinement. This typifies the problem foreseen by Justice Kennedy when he wrote of "dangers inherent when a civil confinement law is used in conjunction with the criminal process." 521 U.S. at 371-72. This case even reflects the circumstances postulated by Justice Kennedy to illustrate how the conjunction of civil confinement and criminal proceedings could go wrong—the use of civil proceedings to restore confinement time shortened by a plea bargain. Where this case deviates from the scene sketched by Justice Kennedy is that the plea agreement in this case, rather than being improvident, arose on account of Crane's already having served nearly as much time as could be imposed for his conduct.

Crane presents forceful arguments that the application of the Act in his circumstances has punitive features. Crane, unlike Hendricks, did not admit that his sexual behavior was on account of an irresistible urge. Nor was there a finding that Crane is unable to control his behavior. Application of the Act in this case parallels circumstances Justice Kennedy cautioned against. However, we can only surmise whether Justice Kennedy would find the State has crossed the line from civil commitment to criminal punishment in the present case. As we previously noted, this case does not arise out of an improvident plea bargain. Here, the State's primary motive for filing the petition was not to obtain treatment for the de-

fendant. However, so long as the State has an evidentiary basis for filing the petition, its motive should not render the resulting judgment and commitment of the defendant to be punitive.

We note that in *In re Care & Treatment of Hay*, 263 Kan. 822, 830-31, 953 P.2d 666 (1998), this court stated that Hay's ex post facto challenge was shattered by the Supreme Court's holding that the Act created a civil rather than criminal proceeding. In a syllabus paragraph, the court declared that commitment under the Act was not criminal or punitive and, therefore, does not violate the prohibition of ex post facto lawmaking. 263 Kan. 822, Syl. ¶ 2.

We will address the remaining issues raised by Crane, as they may again be raised in the district court on remand. Crane argues that the evidence of prior sexual conduct should not have been admitted into evidence when he had agreed to stipulate to the convictions.

The State was required to prove two elements—(1) that Crane had been charged with or convicted of a sexually violent offense and (2) that he suffers from a mental abnormality or personality disorder that makes him likely to engage in repeat acts of sexual violence. K.S.A. 1999 Supp. 59-29a02(a). Accordingly, the jury was instructed as follows:

"The State alleges the respondent is a sexually violent predator. The respondent denies the allegation.

"To establish this charge, each of the following claims must be proved:

1. That the respondent has been convicted of Aggravated Sexual Battery, a sexually violent offense; and

2. That the respondent suffers from a mental abnormality or personality disorder which makes the respondent likely to engage in future predatory acts of sexual violence, if not confined in a secure facility."

Crane offered to stipulate with regard to his status as a convicted sexual offender. The State declined to stipulate. The State argues that evidence of offenses other than the conviction specified in the first element is relevant to the second element because mental health experts base predictions of future sexual behavior on past sexual behavior.

The district court permitted the State to decline to stipulate and to call a number of witnesses who testified about past instances of

Crane's sexual behavior. The statement of facts in the State's brief on appeal recounts the testimony of 11 "behavior" witnesses. Most of them testified about incidents that were not subject to proof. That is, most of them testified about incidents other than the aggravated sexual battery that was the basis for the conviction the jury was required to find.

In *Hay*, the respondent complained about the admission of uncharged conduct. The court made short work of Hay's position: "The critical issues in a sexual predator case make the evidence of prior conduct, charged or uncharged, material evidence in the case. We hold the prohibitions of K.S.A. 60-455 are not applicable or governing in a case of this nature." 263 Kan. at 838. Hay challenged the admission of evidence of specific conduct. The court said it

"was clearly relevant to prove he suffers from the condition of pedophilia and that he is likely to engage in predatory acts of sexual violence in the future. We are hard-pressed to see how such evidence can be prohibited by K.S.A. 60-455 when it is an essential element of the required proof and necessary for the decision-making process of the jury." 263 Kan. at 837.

In this case, Crane argues that K.S.A. 60-447 should be effective where 60-455 was not, and he relies on *State v. Lee*, 266 Kan. 804, 977 P.2d 263 (1999), to give effect to his offer to stipulate to conviction of aggravated sexual battery. K.S.A. 60-447 excludes evidence of specific instances of conduct, other than evidence of conviction of a crime, as proof of a character trait. *Gardner v. Pereboom*, 197 Kan. 188, 416 P.2d 67 (1966). Because most, if not all, of the complained-of evidence was evidence of conviction of crimes, it would not have been excluded by K.S.A. 60-447. Crane's reliance on *Lee* also lacks merit. In that case, the court held that a criminal defendant's request to stipulate that he or she is a convicted felon must be honored and that the stipulation will satisfy the State's burden of proving the convicted felon element of the crime of criminal possession of a firearm. 266 Kan. 804, Syl. ¶ 4. The application of *Lee*, a criminal proceeding, to the present proceeding is questionable due to the criminal/civil dichotomy. However, we need not answer that question. In *Lee*, the court cautioned: "Our views should not be read as limiting the State in presenting a full in-depth story of a prior crime when the prior

crime has relevance independent of merely proving prior felony status for K.S.A. 21-4204(a)(4) [possession of a firearm by a convicted felon]." 266 Kan. at 816. This court held in *Hay* that the evidence of prior conduct was material to the question of likelihood that the respondent would engage in repeat conduct as well as to the element of conviction of prior conduct. Thus, the court's holding in *Lee* does not apply in this sexual predator proceeding.

Crane next argues that the State's failure to personally serve him deprived the district court of jurisdiction. Crane contends that the Act is a subpart of the Care and Treatment Act for Mentally Ill Persons (CTAMIP), K.S.A. 1999 Supp. 59-2945 *et seq.* He would have the court regard the provision for notice to proposed patients within the CTAMIP as an umbrella provision extending to the Act. His construct does not withstand examination of the statutes. Both acts are in the Probate Code, Chapter 59. They do not occupy the same article, however. The CTAMIP constitutes Article 29 of Chapter 59; the Act constitutes Article 29a. The Articles have different names, different definitions, and different functions. Without an express reference in the Act to the notice provision of CTAMIP, there is no basis for believing that it applies equally under both.

Finally, Crane argues that the timing of the State's petition against him did not comply with statutory requirements. The State filed a sexual predator petition against Crane on December 11, 1997. He was released on parole on January 6, 1998. Crane contends that as a consequence of the State's failing to serve him personally with notice, the action was not commenced against him before his conditional release. As discussed in the preceding paragraph, with no personal service requirement in the Act, there is no basis for Crane's contention in that regard.

With respect to the timing of the petition, there is nothing in the record to suggest that it was improper under the version of K.S.A. 59-29a04 that was effective at the time of Crane's release. K.S.A. 1997 Supp. 59-29a04 provided for a petition to be filed by the attorney general within 75 days of receiving written notice that Crane's release was scheduled. K.S.A. 1997 Supp. 59-29a03(a)(1)

required the Department of Corrections to give notice 90 days prior to Crane's anticipated release.

It may be noted that in 1999 the legislature added the following proviso to 59-29a04: "The provisions of this section are not jurisdictional, and failure to comply with such provisions in no way prevents the attorney general from proceeding against a person otherwise subject to the provision of K.S.A. 59-29a01 *et seq.*, and amendments thereto." K.S.A. 1999 Supp. 59-29a04(b).

The judgment of the district court is reversed, and the case is remanded for a new trial.