[2 NYS3d 483]

In the Matter of STATE OF NEW YORK, Respondent, v FRANK P., Appellant.

First Department, February 19, 2015

### APPEARANCES OF COUNSEL

*Marvin Bernstein, Mental Hygiene Legal Service*, New York City (*Kent Mackzum* and *Sadie Zea Ishee* of counsel), for appellant.

*Eric T. Schneiderman, Attorney General*, New York City (*Valerie Figueredo* and *Steven C. Wu* of counsel), for respondent.

### OPINION OF THE COURT

RENWICK, J.P.

The State of New York brought this Mental Hygiene Law article 10 proceeding seeking civil commitment of respondent as a dangerous sex offender. This proceeding, however, preceded the recent pronouncement by the Court of Appeals in *Matter of State of New York v Donald DD.* (24 NY3d 174 [2014]).[1] In *Donald DD.*, the Court of Appeals limited the evidence that can be used to civilly commit a convicted sex offender, and clarified that a sex offender cannot be subject to civil commitment solely because the individual is diagnosed as suffering from an abnormality that predisposes him to commit sexual offenses. In so doing, the Court of Appeals clarifies the line between civil commitment and penal commitment. In this

---

1. *Donald DD.* also decided the appeal in *Matter of State of New York v Kenneth T.* (106 AD3d 829 [2013], *revd* 24 NY3d 174 [2014]).

case, we heed this clarification by dismissing this Mental Hygiene Law article 10 proceeding on the ground that the State has failed to establish by clear and convincing evidence that respondent has or will have serious difficulty controlling his behavior.

## Procedural and Factual Background

Respondent is a 67-year-old sex offender who was convicted of raping and sodomizing four women in their homes, and accused of raping seven more women, over 30 years ago. Respondent's relevant criminal history began in 1970. During a four-month period in 1970, respondent committed four home invasions against four different women in July, August and November. The four home invasions were virtually identical. He targeted women he did not know in the middle of the day. He followed the women to their apartments, forced his way inside as the women opened the door, often with the use of a weapon, and threatened to harm or kill them if they did not cooperate. Respondent forced the women to undress, raped them, and then stole small amounts of cash and petty household items from them.

In addition to the four home invasions and rapes, respondent also robbed two other women and burglarized the apartment of a third woman in August and October 1970. In those cases, respondent followed each woman to her apartment, but was only able to get inside the home of one victim. In all three cases, he stole either very little cash or minor household items.

The four women whose homes respondent invaded identified respondent as their rapist. Respondent was arrested on sexual assault charges in all four cases. However, respondent was indicted for sexual offenses in only one of the home invasions and the indicted charges were dismissed before trial. He was also indicted for various other nonsexual offenses, such as burglary, robbery, and grand larceny, against all of the women he victimized in 1970. For these various cases, respondent was convicted of burglary in the second and third degrees, robbery in the first, second, and third degrees, and grand larceny. He received a maximum prison sentence of 25 years. He was released on parole in May 1977.

Less than a month after his release in May 1977, respondent raped another woman. Over the next four months, he also com-

mitted five other home invasions and rapes that followed a similar pattern as his 1970 crimes. As before, he followed the women to their apartments, where he raped and sodomized them. He left the women tied up or in a closet while he burglarized their homes, fleeing with minor items. All six 1977 victims identified respondent as their rapist. He was indicted for all six rapes in 1977, and was also indicted for various nonsexual offenses, such as robbery and burglary, against all six women.

Respondent was tried first for the charges related to an October 28 rape, and subsequently tried for the charges concerning August 5 and August 30 rapes. A jury convicted him of raping and sodomizing the three women. He was also convicted of nonsexual offenses against each woman. Respondent was sentenced to $12^{1}/_{2}$ to 25 years' imprisonment. Because he violated his parole as a result of his convictions, his maximum prison sentence was extended from 25 years to 46 years—reflecting the time he had not served on his 1970 convictions.

Following these convictions, the prosecution dismissed the indicted (but not tried) charges related to the remaining three rape victims from 1977. In part, the indicted charges were dismissed because as a result of his conviction for the three rapes, respondent had received the maximum sentence allowable under state law and his sentence would not be extended even with additional sexual offense convictions.

Respondent then spent 33 years of continuous incarceration for these convictions. In May 2010, as he was about to be paroled, at the age of 62, the State commenced this civil commitment proceeding against respondent. At trial, the State presented the testimony of two expert witnesses, Dr. Harris and Dr. Kunkle. They similarly testified that respondent has a qualifying mental abnormality under Mental Hygiene Law article 10, and they diagnosed him as suffering from paraphilia "not otherwise specified" (NOS) based on urges related to nonconsenting partners, and antisocial personality disorder (ASPD).

To reach their diagnoses, both experts reviewed respondent's juvenile, criminal, prison, and mental health records. Dr. Kunkle also interviewed respondent. In addition to reviewing the crimes for which respondent was convicted, both experts

also examined the aforementioned sexual offense charges for which he was arrested or indicted, but not tried.[2]

The state experts testified that paraphilia is a "sexual disorder where an individual gets sexual pleasure from sources that are abnormal from typical sexual conduct." Paraphilia NOS permits "clinicians to render a diagnosis of an individual having a paraphilia" when "that paraphilia is not listed specifically" in the Diagnostic and Statistical Manual of Mental Disorders (DSM). Individuals with paraphilia NOS derive "specific sexual gratification from rape" and are aroused by its "nonconsensual nature."

To diagnose paraphilia NOS, the state experts "looked for a recurrent pattern of rape behaviors" that was consistent over at least a six-month period. They also examined whether the behavior was "chronic" and always involved rape. They evaluated the manner in which respondent engaged in the rapes to determine whether he was "aroused enough and interested enough in committing the act to engage in those extra behaviors to carry it out." Finally, they looked for evidence of penetration and ejaculation to demonstrate that respondent was aroused by the rape.

After reviewing respondent's offense history, both experts concluded that the foregoing criteria were satisfied. They also testified that respondent's paraphilia NOS predisposes him to commit sexual offenses and causes him serious difficulty in controlling his sexual impulses, and that he is aroused by forcing someone to have sex with him. Neither expert explained how he arrived at his conclusion that respondent has or will have serious difficulty controlling his sexual behavior.

Further, both experts also diagnosed respondent with ASPD—a disorder that "affects an individual[']s interpersonal relationships" and is characterized by the pervasive "violation of the rights of others." They found that respondent suffered from several of the characteristics of ASPD, including (1) "a lack of conformity to social norms with regard to the law;" (2) deceitfulness; (3) impulsivity; (4) irritability and aggression; (5) lack of remorse; (6) "disregard for the safety of others;" and (7) "irresponsibility for common needs."

---

**2.** Information related to those sexual offense charges were contained in official criminal records such as grand jury indictments, two victim affidavits submitted in criminal court, a presentence report prepared in connection with respondent's 1979 convictions, police reports, documents in the District Attorney's files, and criminal court papers, such as a memorandum submitted to the court by the District Attorney.

The state experts concluded that respondent's ASPD satisfied the definition of a mental abnormality. Dr. Harris explained that respondent's ASPD is so severe that he would satisfy the criteria for a mental abnormality even without a diagnosis of paraphilia NOS because "his volitional control is so poor and the way he thinks about the world and himself is so compromised" that he is still at risk of committing sexual assaults.[3]

Dr. Kunkle acknowledged that respondent had never been disciplined in prison for any sexual misconduct throughout his 33-year incarceration, and that there were no documented instances of his engaging in inappropriate sexual behavior, masturbating, touching female prison staff, or even making inappropriate sexual comments. Dr. Kunkle, however, felt that the paraphilia diagnosis was appropriate because respondent had committed sex crimes shortly after being released from prison in 1977, after serving seven years' incarceration for his 1970 convictions.

Dr. Kunkle also acknowledged that respondent had attended anger management training and sex offender treatment programming while in prison, and, according to the DSM, ASPD tends to remit after the fourth decade of life. He nevertheless felt that respondent continued to suffer from ASPD. Dr. Kunkle also relied upon his interview with respondent shortly before respondent was scheduled to be released from prison, when Dr. Kunkle informed him that he was under consideration for civil commitment pursuant to Mental Hygiene Law article 10. According to Dr. Kunkle, respondent expressed "a great deal of hostility toward the criminal justice system." He referred numerous times to the process of Mental Hygiene Law article 10 as "double jeopardy." Dr. Kunkle believed that this was evidence that respondent's antisocial "attitudes are still present."

Dr. Harris also acknowledged that respondent had not been disciplined in prison for any sexual misconduct throughout his 33-year incarceration. He opined, however, "I don't think his behavior in prison will at all be the behavior that he would engage in outside of prison." Further, the fact that respondent continued to deny his sex crimes demonstrated to Dr. Harris that he had not learned to manage his sexual arousal patterns.

---

3. A diagnosis of ASPD also requires evidence that the individual has conduct disorder—or "antisocial type conduct" prior to the age of 15. In this case, the experts noted that respondent engaged in such conduct starting at 14, when he assaulted a teacher.

He added, "The mindset that he didn't do it is the very mindset that . . . allows him to commit another offense and another offense."

Ultimately, the jury found that respondent suffers from a mental abnormality qualifying him for civil management under Mental Hygiene Law article 10. Following a dispositional hearing where the state experts and respondent testified, Supreme Court found that respondent is not a dangerous sex offender in need of confinement, and ordered instead that he submit to strict and intensive supervision and treatment (SIST) in the community. Supreme Court was persuaded by respondent's lack of sexually deviant behavior while incarcerated; his lack of prison disciplinary violations during the last six years of his sentence; his "constructive work in prison" to complete his education and assist other inmates; his "realistic goals" upon release; and the continued involvement of his family and relatives in his life, to conclude that respondent could live at liberty without reoffending if strictly supervised. Respondent now appeals his SIST on sufficiency grounds.

## Discussion

In reaching its decision in *Matter of State of New York v Donald DD.*, the New York Court of Appeals relied on two United States Supreme Court cases, *Kansas v Hendricks* (521 US 346 [1997]) and *Kansas v Crane* (534 US 407 [2002]). Beginning with *Kansas v Hendricks*, the Supreme Court set forth the substantive due process requirements of statutes that civilly commit sexual offenders (521 US 346). The Kansas Sexually Violent Predator Act permits the State to civilly commit sexually violent predators.[4] In *Kansas v Hendricks*, the State sought to civilly commit Hendricks, an inmate about to be released from prison after serving time for sexually molesting children (521 US at 350). Hendricks challenged the act on substantive due process grounds, among others. The Supreme Court upheld the constitutionality of Kansas's civil commitment of sexually violent predators, as well as Hendricks's confinement (*id.*).

---

4. The statute defines a sexually violent predator as "any person who has been convicted of or charged with a sexually violent offense and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in repeat acts of sexual violence" (Kan Stat Ann § 59-29a02 [a]). It defines "[m]ental abnormality" as "a congenital or acquired condition affecting the emotional or volitional capacity which predisposes the person to commit sexually violent offenses in a degree constituting such person a menace to the health and safety of others" (§ 59-29a02 [b]).

*Kansas v Hendricks* explained that the liberty afforded to citizens by the Constitution is not absolute and that certain exceptions are necessary for the "common good" (521 US at 356-357 [internal quotation marks omitted]). The Court noted that, under certain conditions, it had upheld statutes providing for the civil confinement of individuals who could not control their actions and who posed a threat to the community (*id.* at 357). Articulating the narrow standard under which a person may be committed, the Court explained that a mere finding of dangerousness is generally insufficient to warrant commitment (*id.* at 358). However, proof of a mental illness or abnormality that is linked to the finding of dangerousness "serve[s] to limit involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control," thereby fulfilling the narrow tailoring required by the Due Process Clause (*id.*).[5] In upholding Hendricks's civil commitment, the Court found that an "admitted lack of volitional control, coupled with a prediction of future dangerousness, adequately distinguishe[d] Hendricks from other dangerous persons who [were] perhaps more properly dealt with exclusively through criminal proceedings" (*id.* at 360).

*Kansas v Hendricks*'s reference to lack of control left uncertainty in the governing law—namely, whether a showing that a defendant completely lacked the ability to control himself was necessary to justify civil commitment. Five years later, *Kansas v Crane* (534 US 407 [2002]) directly answered this question. Crane was a very different man from Hendricks, the child molester with no self-control whose commitment the US Supreme Court had upheld. There was less evidence of sex crime recidivism in Crane's case. In *Kansas v Crane*, the State sought civil commitment of Crane, who had previously been convicted of aggravated sexual battery and lewd and lascivious behavior for exposing himself (534 US at 416). The state witnesses agreed that Crane had significant control over his actions (*In re Crane*, 269 Kan 578, 581, 7 P3d 285, 288 [2000], *vacated* 534 US 407 [2002]). Finally, the State's own psychiatric witness estimated that more than 75% of all prisoners suffer from ASPD, hardly making the potential class of committees a narrow group (269 Kan at 585, 7 P3d at 290). Against

---

**5.** The Court left individual states with the discretion to define what constitutes a mental illness or abnormality and explained that the legal significance of these terms need not directly equate with medical standards (*id.* at 359).

this backdrop, the Kansas Supreme Court revisited the question of the Kansas act's constitutionality.

In *Crane*, the respondent argued that the Constitution required the State to show that he could not control his dangerous behavior in order to commit him (*Crane*, 269 Kan at 582, 7 P3d at 288). The Kansas Supreme Court agreed, seizing on language in *Kansas v Hendricks* upholding the act based largely on the committee's lack of volitional control (269 Kan at 586, 7 P3d at 290). The Kansas Supreme Court reversed Crane's commitment and remanded for a new trial at which the jury was to determine whether he could control his behavior (*id.*). The court reasoned that, because Crane was committed on the basis of a "personality disorder," which was not defined in the Kansas act to include a lack of volitional control, the jury had not made the required finding in the initial trial (*id.*). The Court also suggested that the definition of the term "mental abnormality" was unconstitutionally broad, since it includes behavior that a potential committee can control (269 Kan at 585-586, 7 P3d at 290).

The Supreme Court, while agreeing with some of the Kansas court's reasoning, vacated the state decision; the Justices rejected as unworkable the premise that only those with a complete lack of volitional control—who experience "irresistible impulse[s]"—may be civilly committed (*Crane*, 534 US at 411-412 [internal quotation marks omitted]). The Court found that most severely ill people retain some degree of volitional control, and "[i]nsistence upon absolute lack of control would risk barring the civil commitment of highly dangerous persons suffering severe mental abnormalities" (*id.* at 412). The Court, however, also rejected the Kansas Attorney General's position that no lack-of-control determination whatsoever is required. "[T]here must be proof of serious difficulty in controlling behavior" (*id.* at 413). The majority stressed that such findings keep the act constitutional by distinguishing between those eligible for civil commitment and those who must be dealt with exclusively through ordinary criminal proceedings. "That distinction is necessary lest 'civil commitment' become a 'mechanism for retribution or general deterrence'—functions properly those of criminal law, not civil commitment" (*id.* at 412, quoting *Hendricks*, 521 US at 372-373 [Kennedy, J., concurring]).

The New York Court of Appeals has interpreted the Mental Hygiene Law article 10 statute to be consistent with the constitutional requirements of *Hendricks* and *Crane*. Indeed,

the statute requires that all offenders subject to civil management, including SIST, must be found to have a mental abnormality as a threshold qualification. Mental Hygiene Law § 10.03 (i) defines a mental abnormality as "a congenital or acquired condition, disease or disorder that affects the emotional, cognitive, or volitional capacity of a person in a manner that predisposes him or her to the commission of conduct constituting a sex offense and that results in that person having serious difficulty in controlling such conduct."

Article 10 authorizes civil confinement only of those sex offenders whose "mental abnormality" involves such a strong disposition to commit sexual misconduct and an inability to control behavior that the person is dangerous to society (Mental Hygiene Law §§ 10.03 [e]; 10.07 [f]). Mental Hygiene Law article 10, as written, is also designed to provide courts with a mechanism for deciding whether the mental condition of a sex offender suffering from a mental abnormality is so extreme that the more restrictive alternative of confinement is warranted or whether, on the other hand, the least restrictive option, namely SIST, is permitted (*see* Mental Hygiene Law § 10.07 [f]).[6]

Drawing from *Hendricks* and *Crane*, the New York statutory structure does not run afoul of substantive due process because it requires the State to prove that the individual is dangerous, and the dangerousness must be coupled with a mental abnormality, which—by definition—incorporates the additional requirement that the offender have serious difficulty with behavioral control (*Matter of State of New York v Donald DD.*, 24 NY3d 174 [2014]). Moreover, the Court of Appeals has limited the evidence that can be used to civilly confine a convicted sex offender.

Specifically, in *Donald DD.* (24 NY3d at 190-191) the Court held that Donald DD.'s ASPD diagnosis, by itself, was insufficient to establish a "condition, disease or disorder that affects the emotional, cognitive, or volitional capacity of a person in a manner that predisposes him or her to the commission of

---

**6.** The standards applicable in a proceeding seeking confinement pursuant to Mental Hygiene Law § 10.11 (d) (4), after an alleged SIST violation, are the same as those applicable when the proceeding is brought while the sex offender is still incarcerated. "The court shall make its determination of whether the respondent is a dangerous sex offender requiring confinement in accordance with the standards set forth in subdivision (f) of section 10.07" (Mental Hygiene Law § 10.11 [d] [4]). Section 10.07 in turn relies on the definitional provisions of Mental Hygiene Law § 10.03.

conduct constituting a sex offense and that results in that person having serious difficulty in controlling such conduct" (*id.* [emphasis omitted], quoting Mental Hygiene Law § 10.03 [i]). In so concluding, the Court stated that

> "[a] diagnosis of ASPD alone—that is, when the ASPD diagnosis is not accompanied by a diagnosis of any other condition, disease or disorder alleged to constitute a mental abnormality—simply does not distinguish the sex offender whose mental abnormality subjects him to civil commitment from the typical recidivist convicted in an ordinary criminal case. ASPD means little more than a deep-seated tendency to commit crimes. Its use in civil confinement proceedings, as the single diagnosis underlying a finding of mental abnormality as defined by Mental Hygiene Law article 10, proves no sexual abnormality" (*id.* at 190 [citation and internal quotation marks omitted]).

Furthermore, in *Donald DD. (Kenneth T.)*, the Court of Appeals clarified that the State must prove, separate from a finding of mental abnormality required for civil commitment, that the defendant has serious difficulty controlling his behavior. Specifically, the State must demonstrate that as a result of the "serious mental illness, abnormality, or disorder," a person also would have serious difficulty controlling his behavior if released (24 NY3d at 187, 189). This is because, as *Crane* explained, sex offenders do not face detention simply because society considers them likely to re-offend; offenders face detention only if society also deems that they are substantially unable to control their behavior (*Crane*, 534 US at 411-412).

In addition, in *Donald DD. (Kenneth T.)*, the Court of Appeals rejected the expert's qualitative description of the respondent's ability to control his sexual misconduct as not meeting the clear and convincing standard (24 NY3d at 187-188). Kenneth T.'s article 10 trial differed from Donald DD.'s in that the factfinder heard evidence that Kenneth T. suffered not only from ASPD but also from paraphilia NOS. At the outset, the Court of Appeals expressed some misgivings as to whether a diagnosis of paraphilia NOS is sufficient to support a finding of mental abnormality within the meaning of Mental Hygiene Law article 10 (*id.* at 186). Nevertheless, the Court found it "unnecessary . . . to decide any issue concerning paraphilia NOS, because we need not decide whether there was legally sufficient evidence that Kenneth T. had a condition 'that predispose[d] him . . . to the commission of conduct constituting a sex offense'

within the meaning of Mental Hygiene Law § 10.03 (i)" (*id.* at 187). Instead, in *Donald DD.* (*Kenneth T.*), the Court held "that, even assuming that mental abnormality was demonstrated to that extent, there was not clear and convincing evidence that Kenneth T. had 'serious difficulty in controlling' his sexual misconduct within the meaning of section 10.03 (i)" (*id.*).

In *Donald DD.* (*Kenneth T.*), the State relied primarily on expert testimony on the issue of whether the respondent had serious difficulty controlling conduct amounting to sex offenses (*id.* at 187). On this issue, Dr. Kirschner identified the fact that respondent carried out both offenses in a way that would allow for identification by his victims, and the fact that he attempted the second rape despite having spent many years in prison for the earlier crime (*id.*). The Court of Appeals, however, found this qualitative description of defendant's ability to control his sexual urges legally insufficient, explaining:

> "It is evident that circumstances of this nature are insufficient to show, by clear and convincing evidence, that a person has serious difficulty in controlling his sexual urges within the meaning of Mental Hygiene Law § 10.03 (i). A rapist who killed his victims so that they could not identify him may have serious difficulty controlling his sexual urges. Conversely, one who raped an acquaintance and permitted her to escape may not have serious difficulty controlling his sexual urges within the meaning of article 10. A person who committed a rape soon after serving a very short sentence for sexual abuse may have serious difficulty in controlling his sexual misconduct. Conversely, one who committed a rape soon after serving a very lengthy sentence may not have serious difficulty controlling his sexual urges. Rather, the rape may be a crime of opportunity, and the defendant willing to risk the prospect of a return to incarceration.

> "Undoubtedly, sex offenders in general are not notable for their self-control. They are also, in general, not highly risk-averse. But beyond these truisms, it is rarely if ever possible to say, from the facts of a sex offense alone, whether the offender had great difficulty in controlling his urges or simply decided to gratify them, though he knew he was running a significant risk of arrest and imprisonment" (*id.* at 187-188).

While in *Donald DD.* the Court of Appeals declined to elaborate "from what sources sufficient evidence of a serious difficulty controlling sex-offending conduct may arise," as aforementioned, the Court did provide some important guidelines that are helpful to the instant appeal (24 NY3d at 188). First, in *Donald DD.*, the Court made clear that a finding that respondent had serious difficulty controlling his sexual conduct must be made independent of the threshold determination that the respondent suffers from a mental abnormality within the meaning of the statute (*id.*). In doing so, the Court explicitly rejected the dissent's suggestion that *Crane* does not impose an additional element to justify civil confinement because such requirement is implicit "where the State's evidence conforms to the statutory definition of a mental abnormality, i.e., the State shows that the offender suffers from any 'congenital or acquired condition, disease or disorder' that predisposes the person to sexual misconduct and results in difficulty controlling sexual urges" (*Donald DD.*, 24 NY3d at 196 [Graffeo, J., dissenting in *Donald DD.*], quoting Mental Hygiene Law § 10.03 [i]).

Second, as indicated, *Donald DD.* also makes clear that the burden of proof, to establish serious difficulty of controlling sex-offending conduct, is clear and convincing evidence. The Court explained that such evidence "cannot consist of such meager material as that a sex offender did not make efforts to avoid arrest and reincarceration" (24 NY3d at 188). Likewise, while noting that "[a] detailed psychological portrait of a sex offender would doubtless allow an expert to determine the level of control the offender has over his sexual conduct," the Court found that expert testimony that a sex offender lacks "internal controls such as a conscience that might curb his impulses" is also "not a basis from which serious difficulty in controlling sexual conduct may be rationally inferred" (*id.*) This is because "[i]t is as consistent with a rapist who could control himself but, having strong urges and an impaired conscience, decides to force sex upon someone, as it is with a rapist who cannot control his urges" (*id.*).

Applying the parameters established in *Donald DD.* to the proceeding herein, we find that the State failed to meet its burden of proof required to establish that respondent is a sex offender that mandates SIST under Mental Hygiene Law article 10. As fully detailed above, besides relying on respondent's criminal history that occurred prior to his 33-year incarceration, the State relies primarily on two expert wit-

nesses, both of whom diagnosed respondent as suffering from two abnormalities (paraphilia NOS and ASPD) that predispose him to commit sexual offenses. However, as *Donald DD.* held, a diagnosis of ASPD cannot serve as the factual predicate of sexual abnormality under Mental Hygiene Law article 10 (24 NY3d at 190).

With regard to the experts' diagnosis of paraphilia NOS, the experts opined that the abnormality resulted in respondent's serious difficulty in controlling his sexual behavior. Neither of the two state experts, however, conducted a quantified analysis of the factors that led to their individual conclusions. Instead, both state experts opined in a conclusory fashion that respondent's paraphilia NOS "predispose[s] him to commit sex offenses and cause[s] him to have serious difficulty controlling his sexual impulses" (*id.* at 198). But drawing a conclusion that a respondent has a volitional impairment from only a diagnosis of sexual abnormality violates the Court of Appeals' recent mandate in *Donald DD.* that the State must prove separate from the abnormality that a sex offender has serious difficulty controlling his behavior. As *Donald DD.* recognized, the concept of predisposition and volition are separate and distinct. A disorder like paraphilia NOS might predispose someone to the commission of sexual offenses, but the offender might have enough degree of control over the disposition.

Nor do we find the evidence in the record relied on by the state experts, for their diagnosis, sufficient to establish by clear and convincing evidence that respondent has or will have serious difficulty controlling his behavior. Significantly, respondent spent 33 consecutive years in prison and there is no evidence that he engaged in any inappropriate sexual behavior during that prolonged period to suggest that he had serious difficulty controlling his behavior in such an environment. Instead, defendant voluntarily attended anger management and sex offender treatment programs while in prison. To be clear, one of the state experts noted that, during his recent interview of respondent, he "expressed a great deal of hostility toward the criminal justice system" and constantly asserted that he only engaged in "consensual" sex with his victims. However, given *Donald DD.*, we find that the inferences that logically flow from such evidence are insufficient to support a determination, under the clear and convincing evidence standard, that respondent has or will have serious difficulty controlling his sexual behavior.

Accordingly, the order of the Supreme Court, New York County (Daniel Conviser, J.), entered on or about February 4, 2013, which, upon a jury verdict that respondent suffers from a mental abnormality, determined, after a dispositional hearing, that respondent is a sex offender requiring SIST, should be reversed, on the law, without costs, and the petition dismissed.

SAXE, MOSKOWITZ, DEGRASSE and RICHTER, JJ., concur.

Order, Supreme Court, New York County, entered on or about February 4, 2013, reversed, on the law, without costs, and the petition dismissed.