[No. S107266. Aug. 21, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT WILLIAMS, Defendant and Appellant.

COUNSEL

Gerald J. Miller, under appointment by the Supreme Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Steven T. Oetting, Bradley A. Weinreb, Janelle Boustany and Felicity Senoski, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**BAXTER, J.**—In *Kansas v. Crane* (2002) 534 U.S. 407 [151 L.Ed.2d 856, 122 S.Ct. 867], the United States Supreme Court held that the safeguards of personal liberty embodied in the due process guaranty of the federal Constitution prohibit the involuntary confinement of persons on the basis that they are dangerously disordered without "proof [that they have] serious difficulty in controlling [their dangerous] behavior." (*Id.* at p. 413.) California's Sexually Violent Predators Act (SVPA or Act; Welf. & Inst. Code, § 6600 et seq.)[1] does not use that precise language in defining who is eligible for involuntary civil commitment as a sexually violent predator.

In September 2001, before *Kansas v. Crane, supra*, 534 U.S. 407, was decided, defendant was committed under the SVPA by a jury that received instructions in the statutory language. However, the jury was not separately and specifically instructed on the need to find serious difficulty in controlling behavior. Defendant claims a separate "control" instruction was constitutionally necessary under *Kansas v. Crane*.

The Court of Appeal correctly rejected this contention. ■ By its express terms, the SVPA limits persons eligible for commitment to those few who have already been convicted of violent sexual offenses against multiple victims (§ 6600, subd. (a)(1)), and who have " diagnosed mental disorder[s]" (*ibid.*) "affecting the emotional or volitional capacity" (*id.*, subd. (c)) that "predispose[] [them] to the commission of criminal sexual acts in a degree constituting [them] menace[s] to the health and safety of others" (*ibid.*), such that they are "likely [to] engage in sexually violent criminal behavior" (*id.*, subd. (a)(1)). This language inherently encompasses and conveys to a fact finder the requirement of a mental disorder that causes serious difficulty in controlling one's criminal sexual behavior. The SVPA's plain words thus suffice "to distinguish the dangerous sexual offender whose serious mental

---

[1] All further unlabeled statutory references are to the Welfare and Institutions Code.

illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case." (*Kansas v. Crane, supra,* 534 U.S. 407, 413.) Several other state courts have reached the same result when considering the effect of *Kansas v. Crane* on statutes similar to the SVPA.

Moreover, even if instructional error had occurred, the Court of Appeal properly found no prejudice. On the evidence presented at defendant's trial, no rational jury could have failed to find he harbored a mental disorder that made it seriously difficult for him to control his violent sexual impulses. Hence, the absence of a "control" instruction was harmless beyond a reasonable doubt.

Accordingly, we will affirm the judgment of the Court of Appeal.

## FACTS

In January 1981, and again in June 1981, defendant forcibly raped separate victims. In the first 1981 incident, defendant masturbated in front of a woman in a laundromat. He then grabbed her, and, as she attempted to flee, she fell. Defendant recaptured her, dragged her to a nearby park, and began to rape her. When police arrived, the rape was still in progress, and they had to physically remove defendant from on top of the victim.

In the second 1981 incident, defendant, who was sitting behind a woman at a stadium concert, began touching and harassing her. When she got up to use the restroom, he followed her and dragged her into a men's room that was posted with an "out of order" sign. The victim said she needed to take medicine and asked if she could get into her purse, hoping to retrieve a knife to defend herself. Defendant replied, "No, bitch. I am no fool." He then threw her down, beat her with his fists, tore off her clothes, forced her to orally copulate him, and raped her. Defendant was convicted of two counts of rape and sentenced to state prison.

He was paroled in early 1987. In June 1987, while still on parole, he gained entry to a home near where he was staying by telling the female resident that he needed to use her telephone to get help with his disabled vehicle. When she left the living room to allow him to make the call in private, he followed her into her bedroom. He told her he had been watching her and announced his intentions. When she tried to scream and fight him off, he slapped her. He threw her down on the bed, spread her legs with his hand, removed her clothing, and raped her. When he was finished, she persuaded him to leave and called the police. Before they arrived, he returned to her residence two more times to attempt to retrieve his eyeglasses. Defendant was convicted of burglary, sexual battery, and three counts of rape. He was again sentenced to state prison.

During both his prison terms, defendant engaged in acts of sexual misconduct. While serving his first term, he exposed himself to female prison staff. During his second term, he openly masturbated in the prison library and exposed himself in groups where females were present.

In June 1999, as defendant approached the parole date for his second term, the San Bernardino County District Attorney filed a petition alleging that he was a sexually violent predator. In December 1999, while confined at Atascadero State Hospital awaiting his SVPA trial, defendant exposed himself and masturbated publicly in the patient dining room.

At the trial in September 2001, the prosecution called as expert witnesses Dr. Dennis Sheppard and Dr. Kent Franks, both licensed psychologists. Both witnesses reviewed documents detailing defendant's past crimes, as well as his clinical records. After being informed of his right to do so, defendant had declined to be interviewed by Dr. Sheppard. Defendant had spoken at some length on one occasion with Dr. Franks, but he refused to answer specific questions and declined a second interview. Based on the available information, both experts testified that defendant met the criteria for commitment under the SVPA.

Among other things, Dr. Sheppard testified as follows: Defendant suffers from "paraphilia, not otherwise specified" (paraphilia NOS)—a mental disorder characterized by intense and recurrent fantasies, urges, and behaviors about sex with nonconsenting persons, which symptoms persist for six months or more and cause significant dysfunction or personal distress. Paraphilic rape is "that obsessive driven rape uncontrollable for the most part that [persons with this disorder]—you know, feel driven to commit." The single-minded determination with which defendant repeatedly pursued the consummation of his desire for nonconsensual sex, regardless of circumstances or surroundings, is evidence of defendant's paraphilia,[2] as are his persistent episodes of public exposure and masturbation in confinement. Another important factor is defendant's own acknowledgement of his sexual pathology, "similar to, you know, 'I feel like a fish on a hook and I don't have control.'"

Dr. Sheppard explained that paraphilia is a chronic, incurable disorder, though patients can be helped to control their sexually deviant behaviors. However, said Dr. Sheppard, defendant's emotional or volitional control is further impaired by the fact that he also suffers from a delusional disorder known as "psychosis, not otherwise specified" (psychosis NOS). According to

---

[2] Dr. Sheppard distinguished a rape committed as a crime of opportunity, as where a burglar enters a home to steal property, but by happenstance encounters a victim and takes advantage of the circumstance to commit a sexual assault.

Dr. Sheppard, this condition increases his impulsivity and makes him less likely to appreciate the reality of the situation. In Dr. Sheppard's view, defendant's disorders predispose him to sexually violent criminal behavior, as evidenced by his repeated misconduct of this nature and the fact that "even in a controlled setting [he] continues to sexually act out in about the only way he can."

When asked to explain his understanding of the SVPA's legal standard for a diagnosable mental disorder, Dr. Sheppard said he thought that by encompassing both congenital and acquired conditions, and both emotional and volitional impairments, the law meant "to indicate that, you know, it doesn't matter whether you got this disorder from biology or whether you learned it. And that . . . the disorder impairs your emotional or volitional control and that because of that mental disorder that impairs those, that you are likely to commit sexually violent acts." Asked to assess defendant's overall risk of reoffense, Dr. Sheppard opined that "he has a high likelihood of reoffending" if released without treatment.

Dr. Franks also diagnosed defendant with paraphilia NOS and psychosis NOS, and he agreed with Dr. Sheppard that defendant's rapes were of the paraphilic type. Dr. Franks further concluded that defendant suffers from polysubstance abuse—i.e., drug and alcohol dependence—and severe "personality disorder, not otherwise specified," with paranoid and antisocial features. According to Dr. Franks, defendant does not "have very good control over his impulses or his emotions in general because he suffers from a mental illness," and his drug and alcohol dependence exacerbates the problem by further reducing inhibitions.

Assessing the "dynamic" factors affecting defendant's risk of reoffense (i.e., those environmental and psychological factors that could be expected to influence future behavior), Dr. Franks said "the most significant is [that] he has very poor control over his impulses and . . . very poor control over his emotional functioning," as particularly demonstrated by his sexual exhibitionism while confined. As Dr. Franks recounted, "The records from the prison indicate he was cited five times for exposing himself, and I counted six instances in three months at Atascadero of indecent exposure. That doesn't count other instances where he cut the crotch of his shorts out so that his penis was exposed. To me that's suggesting incredibly poor impulse control. That's a risk factor." In sum, Dr. Franks concluded that defendant "is at really high risk. There is basically no doubt [that] without supervision and treatment he would reoffend."[3]

---

[3] In addition to the other clinical and historical data on which they relied, both Dr. Sheppard and Dr. Franks rated defendant on the so-called Static-99 scale, which measures the statistical risk of reoffense based on characteristics of the subject's personal history and past offenses as

The jury was instructed in the language of the SVPA, pursuant to a modified version of CALJIC No. 4.19. This instruction explained that a sexually violent predator is one who, inter alia, "has a currently diagnosed mental disorder that makes him a danger to the health and safety of others in that it is likely that he will engage in sexually violent criminal behavior," and that a " '[d]iagnosed mental disorder' includes a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others." Defendant requested, and was refused, an additional instruction that "the diagnosed mental disorder must render the person *unable to control* his dangerous behavior." (Italics added.) The jury found him to be a sexually violent predator, and he was committed to the custody of the Department of Mental Health.

Defendant appealed, asserting prejudicial error in the trial court's failure to give his "unable to control" instruction. While the matter was pending in the Court of Appeal, the United States Supreme Court decided *Kansas v. Crane*, *supra*, 534 U.S. 407. That decision held that the mental abnormality or personality disorder necessary for involuntary civil commitment of dangerously disordered sex offenders does not require "*total* or *complete* lack of [behavioral] control" (*id.* at p. 411, italics in original), but there must be "proof of *serious difficulty* in controlling behavior" (*id.* at p. 413, italics added). Defendant filed a supplemental brief, arguing that *Kansas v. Crane* required a "serious difficulty" instruction.

Thereafter, the Court of Appeal affirmed the judgment. The Court of Appeal reasoned as follows: Defendant's requested instruction, which would have required a finding he was "unable" to control his behavior, was incorrect under *Kansas v. Crane, supra,* 534 U.S. 407. To the extent *Kansas v. Crane* nonetheless requires "serious difficulty" in controlling behavior, that standard is inherently encompassed and subsumed by the SVPA's definitions of "sexually violent predator" and "diagnosed mental disorder." Thus, no additional "control" instruction was needed. Even if instructional error occurred, defendant suffered no prejudice. Given the "strong, and essentially uncontested, evidence of defendant's lack of control over his sexual behavior," no rational fact finder would have reached a more favorable result had his requested instruction been given. Hence, any error in refusing the instruction was harmless beyond a reasonable doubt.

We granted review. We will affirm the Court of Appeal's judgment.

---

they compare with those of known criminal sexual recidivists. Both experts agreed that defendant scored a 9 on this scale, equating to a high risk of reoffense, i.e., 39 percent within five years, 45 percent within 10 years, and 52 percent within 15 years.

## DISCUSSION

■ As in the Court of Appeal, defendant argues that his SVPA commitment is invalid under *Kansas v. Crane, supra,* 534 U.S. 407, because the statute's literal language fails to express the federal constitutional requirement of proof of a mental disorder that causes "serious difficulty in controlling behavior" (*id.* at p. 413), and the jury was not specifically instructed on the need to find such impairment of control. For reasons we now explain, we reject this contention.[4]

The SVPA, enacted in 1996 (Stats. 1995, ch. 763, § 3) and thereafter amended, permits the involuntary civil commitment or recommitment, for two-year terms of confinement and treatment, of persons who are found, in jury trials (§ 6604), and beyond a reasonable doubt (§ 6603, subd. (a)), to be "sexually violent predator[s]" (§ 6604). The Act defines a sexually violent predator as one "who has been convicted of a sexually violent offense against two or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (§ 6600, subd. (a)(1).) A " '[d]iagnosed mental disorder' includes a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others." (*Id.*, subd. (c).)

The year after the SVPA was adopted, the United States Supreme Court considered whether the definition of "mental abnormality" in Kansas's sexually violent predator act satisfied substantive due process requirements for the involuntary civil commitment of dangerously disordered persons. The court ruled that this definition—which closely paralleled California's definition of "diagnosed mental disorder"—was constitutionally valid. (*Kansas v. Hendricks* (1997) 521 U.S. 346 [138 L.Ed.2d 501, 117 S.Ct. 2072] (*Hendricks*).)

---

[4] Though they did not raise the point in the Court of Appeal, the People suggest here that defendant has waived his instructional argument, because in this *civil* proceeding (see *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1170–1179 [81 Cal.Rptr.2d 492, 969 P.2d 584] (*Hubbart*)), he may not complain that the court should have given an instruction other than the *incorrect* "unable to control" language he proffered at trial. (Citing *Orient Handel v. United States Fid. & Guar. Co.* (1987) 192 Cal.App.3d 684, 699 [237 Cal.Rptr. 667]; see also 7 Witkin, Cal. Procedure (4th ed. 1997) Trial, § 272, pp. 318–319.) But if the wording of defendant's proposed instruction was incorrect, that was confirmed only by the United States Supreme Court's subsequent decision in *Kansas v. Crane, supra,* 534 U.S. 407. Under the circumstances, the Court of Appeal properly proceeded to address the issue whether *Kansas v. Crane* itself imposed *some* requirement to instruct specifically on impairment of behavioral control. In reviewing the decision of the Court of Appeal (Cal. Const., art. VI, § 12, subd. (b); Cal. Rules of Court, rule 28), we may and should do the same (see Cal. Rules of Court, rule 29(b)(1)).

As the *Hendricks* court explained, Kansas had adopted its statute to deal with a " 'small but extremely dangerous group of sexually violent predators . . . who do not have a mental disease or defect that renders them appropriate for involuntary treatment pursuant to the [general involuntary civil commitment statute], [but instead] generally have anti-social personality features which are unamenable to existing mental illness treatment modalities' " and which make them highly likely to engage in repeated acts of predatory sexual violence. (*Hendricks, supra,* 521 U.S. 346, 351, quoting Kan. Stat. Ann., § 59-29a01.)

Accordingly, the Kansas law provided for the involuntary civil commitment of certain persons who had been convicted of, or charged with, sexually violent offenses, " 'and who suffer[ed] from a mental abnormality or personality disorder which [made] [them] likely to engage in . . . predatory acts of sexual violence.' " (*Hendricks, supra,* 521 U.S. 346, 352, quoting Kan. Stat. Ann., § 59-29a02(a).) A " 'mental abnormality' " was defined as a " 'congenital or acquired condition affecting the emotional or volitional capacity which predisposes the person to commit sexually violent offenses in a degree constituting such person a menace to the health and safety of others.' " (*Hendricks,* at p. 352, quoting Kan. Stat. Ann., § 59-29a02(b).)

The constitutional challenge arose in the case of Leroy Hendricks, a lifelong sexual offender who admitted that when he " '[got] stressed out,' he '[could not] control the urge' to molest children." (*Hendricks, supra,* 521 U.S. 346, 355.) Near the conclusion of his latest prison term, on a conviction for "taking indecent liberties" with two adolescent boys, the state petitioned to confine him civilly as a sexually violent predator. In a jury trial, his extensive history of criminal sexual conduct was detailed. A state doctor testified, and Hendricks agreed, that he suffered from incurable pedophilia. The jury unanimously found he was a sexually violent predator. After determining that pedophilia satisfied the statutory definition of a "mental abnormality," the trial court ordered his commitment. (*Id.* at pp. 355–356.)

The Kansas Supreme Court reversed. It held that substantive due process permits involuntary civil commitment only of a person proven, by clear and convincing evidence, to be both (1) mentally ill and (2) a danger to himself and others. The Kansas statute's definition of "mental abnormality," the state high court concluded, did not satisfy the necessary "mental illness" component of an involuntary civil commitment. (*Hendricks, supra,* 521 U.S. 346, 356.)

The United States Supreme Court disagreed. As it explained, ". . . States have in certain narrow circumstances provided for the forcible civil detainment of people who are unable to control their behavior and who thereby

pose a danger to the public health and safety. [Citations.] We have consistently upheld such involuntary commitment statutes provided the confinement takes place pursuant to proper procedures and evidentiary standards. [Citations.]" (*Hendricks, supra,* 521 U.S. 346, 357.)

The court noted: "We have sustained civil commitment statutes when they have coupled proof of dangerousness with the proof of some additional factor, such as a 'mental illness' or 'mental abnormality.' [Citations.] These added statutory requirements serve to limit involuntary civil commitment to those who suffer from a volitional impairment rendering them dangerous beyond their control. The Kansas Act *is plainly of a kind* with these other civil commitment statutes: It requires a finding of future dangerousness, and then links that finding to the existence of a 'mental abnormality' or 'personality disorder' *that makes it difficult, if not impossible, for the person to control his dangerous behavior.* [Citation.] The precommitment requirement of a 'mental abnormality' or 'personality disorder' is consistent with the requirements of these other statutes that we have upheld in that it narrows the class of persons eligible for confinement to those who are unable to control their dangerousness." (*Hendricks, supra,* 521 U.S. 346, 358, italics added.)

Hendricks argued that "mental abnormality" was simply a phrase coined by the Kansas Legislature, not a clinically recognized form of mental illness. However, the high court admonished, "the term 'mental illness' is devoid of any talismanic significance. Not only do 'psychiatrists disagree widely and frequently on what constitutes mental illness,' [citation], but the Court itself has used a variety of expressions to describe the mental condition of those properly subject to civil confinement. [Citations.] [¶] Indeed, we have never required state legislatures to adopt any particular nomenclature in drafting civil commitment statutes. Rather, we have traditionally left to legislators the task of defining terms of a medical nature that have legal significance. [Citations.] As a consequence, the States have, over the years, developed numerous specialized terms to define mental health concepts. Often, these definitions do not fit precisely with the definitions employed by the medical community." (*Hendricks, supra,* 521 U.S. 346, 359.)

The Kansas statute, the court noted, set forth "criteria relating to an individual's inability to control his dangerousness" that were comparable to other civil commitment laws the court had upheld. (*Hendricks, supra,* 521 U.S. 346, 360.) Moreover, the court observed, Hendricks himself amply met these criteria; he had been diagnosed with pedophilia, "a condition the psychiatric profession itself classifies as a serious mental disorder," and he admitted he could not control his urge to molest children. (*Ibid.*) "This admitted lack of volitional control, coupled with a prediction of future dangerousness, adequately distinguishes Hendricks from other dangerous

persons who are perhaps more properly dealt with exclusively through criminal proceedings." Due process standards for his commitment, said the court, therefore were satisfied. (*Ibid.*) Accordingly, the judgment of the Kansas Supreme Court was reversed. (*Id.* at p. 371.)[5]

In *Hubbart, supra*, 19 Cal.4th 1138, we addressed similar issues in connection with California's SVPA. Christopher Hubbart had been convicted in 1973, and again in 1982, of felonies arising from sexual assaults against women who were strangers to him. His pattern in these crimes was to break into homes in the early morning hours, bind the sole female occupants, place pillowcases over their heads, and commit forcible sex acts. In more recent incidents, he had administered an enema to the victim, or otherwise cleaned the victim's rectal cavity.

After the 1973 conviction, Hubbart was committed to Atascadero State Hospital as a mentally disordered sex offender. There he received intensive therapy, including treatment for his sexually deviant behavior. He was released as an outpatient in 1979, but readmitted in 1981 when he began reoffending. In 1990, while on parole after his second conviction, he assaulted a female jogger. He was convicted of false imprisonment and returned to prison. As Hubbart's parole release date approached, an SVPA petition was filed.

At Hubbart's commitment trial, psychologists diagnosed him with severe paraphilia NOS, characterized by such features as rape, bondage, sodomy, and klismaphilia (arousal by administration of enemas). They said the condition had persisted for over 20 years—Hubbart's entire adult life—and was accompanied by significant disruption in other areas of social functioning. Hubbart's risk of reoffense was high, the experts opined, as evidenced by the number and frequency of his violent sexual assaults committed during brief periods of freedom, a lack of insight into his problem, including means of controlling precipitating stress, and an inability to empathize with his victims. He was committed as a sexually violent predator.

On appeal, Hubbart mounted multiple constitutional attacks on the SVPA, including a claim that the statute violated "substantive due process" guarantees of the state and federal Constitutions. In his substantive due process

---

[5] Justice Thomas's majority opinion in *Hendricks, supra*, 521 U.S. 346, was signed by the Chief Justice and by Justices O'Connor, Scalia, and Kennedy. Justice Kennedy also filed a concurring opinion stating he joined the majority opinion "in full" (*id.* at p. 371 (conc. opn. of Kennedy, J.)) and that "[o]n the record before us," the Kansas statute conformed to the court's due process precedents (*id.* at p. 373). Justice Kennedy admonished only that "[i]f . . . civil confinement *were to become* a mechanism for retribution or general deterrence, or if it *were shown* that mental abnormality is too imprecise a category to offer a solid basis for concluding that civil detention is justified, our precedents would not suffice to validate it." (*Ibid.*, italics added.)

attack, he urged that the SVPA's definition of a "diagnosed mental disorder" (§ 6600, subd. (c)) is impermissibly broad, because it is not limited to true " 'mental illness,' " i.e., " 'serious cognitive, perceptual or affective dysfunction,' " but extends to "mental disorders characterized primarily by an inability to control sexually violent impulses and behavior." (*Hubbart, supra,* 19 Cal.4th 1138, 1152 [81 Cal.Rptr.2d 492, 969 P.2d 584].)

We rejected this argument. Adhering closely to the reasoning of *Hendricks, supra,* 521 U.S. 346, we explained that "civil commitment is permissible as long as the triggering condition consists of 'a volitional impairment rendering [the person] dangerous beyond their control.' [Citation.]" (*Hubbart, supra,* 19 Cal.4th 1138, 1156.) However, we noted, "[t]he [*Hendricks*] court made clear that due process does not dictate the precise manner in which this 'volitional impairment' is statutorily described." (*Ibid.*) Indeed, we stressed, "*Hendricks* emphasized the importance of deferring to the legislative branch in an area which is analytically nuanced and dependent upon medical science." (*Ibid.*)

Turning to the SVPA itself, we observed that, aside from "nonsubstantive differences in grammar," our statute "tracks the Kansas scheme verbatim in describing the [required] mental disorder as a 'congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others.' [Citation.] *Through this language, the Act targets sexual offenders who suffer from a diagnosed 'volitional impairment' making them 'dangerous beyond their control.'* (*Hendricks, supra,* 521 U.S. 346, 358.)" (*Hubbart, supra,* 19 Cal.4th 1138, 1157, italics added.)

Moreover, *Hubbart* emphasized, "[t]he SVPA also establishes the requisite connection between impaired volitional control and the danger posed to the public. Much like the Kansas law at issue in *Hendricks,* our statute defines [a sexually violent predator] as a person who has committed sexually violent crimes and who currently suffers from 'a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior.' [Citation.] Through this language, the SVPA plainly requires a finding of dangerousness. *The statute then 'links that finding' to a currently diagnosed mental disorder characterized by the inability to control dangerous sexual behavior.* (*Hendricks, supra,* 521 U.S. 346, 358.) This formula permissibly circumscribes the class of persons eligible for commitment under the Act." (*Hubbart, supra,* 19 Cal.4th 1138, 1158, fn. omitted, italics added.)

Neither *Hendricks, supra,* 521 U.S. 346, nor *Hubbart, supra,* 19 Cal.4th 1138, suggested that *new* elements or requirements, absent from the literal

statutory language, were being *read into* these schemes as a condition of their constitutionality. (Cf. *In re Crane* (2000) 269 Kan. 578 [7 P.3d 285, 290].) On the contrary, the core holding of each of these cases was that (1) when drafting involuntary civil confinement laws, states have considerable leeway in describing and defining the necessary link between a control-impairing disorder and a prediction of future dangerousness, and (2) the particular language chosen for inclusion in the statutes under consideration—Kansas's in the case of *Hendricks*, and California's in the case of *Hubbart*—satisfied this basic due process requirement.

■ In other words, these decisions emphasized, the *words* used by the Kansas and California laws themselves *inherently and adequately convey* the crucial class-restricting elements of future dangerousness linked to a disorder-related inability to control behavior. It necessarily follows that, if supported by substantial evidence, any finding of eligibility for commitment under these statutes, when made pursuant to *the statutory language itself*, also meets constitutional standards.

The recent, narrow decision in *Kansas v. Crane, supra*, 534 U.S. 407, dictates no different result. There, the United States Supreme Court revisited, for limited purposes, the Kansas law it had upheld in *Hendricks, supra*, 521 U.S. 346.

The case involved Michael Crane, who, within 30 minutes on the same day in January 1993, exposed himself to a tanning salon attendant and committed an aggravated sexual battery on a video store clerk. After his felony conviction for the latter incident, the state sought to commit him as a sexually violent predator.

The experts at Crane's commitment trial indicated he suffered from antisocial personality disorder, with *some* difficulty in controlling sexual impulses. The jury was instructed in the words of the Kansas statute (1) that commitment as a sexually violent predator could be based on a " 'mental abnormality *or* personality disorder' " (italics added) which made it likely the person would reoffend, and (2) that a " 'mental abnormality' " was a " 'condition affecting the emotional or volitional capacity' " that predisposed the person to commit sexually violent offenses to a degree that endangered the health and safety of others. (*In re Crane, supra*, 7 P.3d 285, 288.) The jury further heard that a " 'personality disorder' "—*undefined in the statute*—included an " 'antisocial personality disorder.' " (*Ibid.*) Crane was found eligible for commitment.

Crane appealed, arguing, among other things, that there had been no sufficient determination of his inability to control his behavior. The Kansas

Supreme Court understood Crane's contention in this regard to be that "the [United States] Supreme Court [in *Hendricks*, *supra*, 521 U.S. 346] read a volitional impairment requirement *into* the [Kansas] Act as a *condition* of its constitutionality." (*In re Crane*, *supra*, 7 P.3d 285, 290, italics added.)

Inexplicably, the Kansas court accepted this view of *Hendricks*, *supra*, 521 U.S. 346, concluding that *Hendricks* had *not* endorsed the statute's *literal language* as constitutionally satisfactory. (*In re Crane*, *supra*, 7 P.3d 285, 290.) Thus freed to decide that issue for itself, the court concluded that the plain language of the Kansas statute *did not* presuppose a finding of impaired control, but actually implied otherwise. The court first noted that the statute's definition of a committable "mental abnormality" could involve an impairment of *either* "emotional" *or* "volitional" capacity, thus suggesting that the "emotional" prong did not involve helplessness to control behavior. (*Ibid.*) Moreover, the court observed, the Kansas statute allowed commitment on the basis of a "personality disorder," a vague condition which (1) had no precise clinical parameters, (2) was not statutorily defined to require *any* impairment, emotional *or* volitional, and (3) according to one expert's deposition testimony, was shared by 75 percent of the prison population. (*Ibid.*)

The Kansas court concluded that because the Kansas statute's words did not themselves convey a requirement of inability to control behavior, the constitutional necessity for such a finding must therefore be expressed in further instructions. Accordingly, the court held, failure to instruct Crane's jury specifically on the need for lack of control was error. The court therefore reversed Crane's commitment and remanded for a new trial under proper instructions. (*In re Crane*, *supra*, 7 P.3d 285, 290.)

On narrow grounds, the United States Supreme Court *overturned* the Kansas Supreme Court's decision. The high court interpreted the Kansas court as holding "that *Hendricks*[, *supra*, 521 U.S. 346] insists upon 'a finding that the defendant *cannot* control his dangerous behavior'—even if (as provided by Kansas law) problems of 'emotional capacity' and not 'volitional capacity' prove the 'source of bad behavior' warranting commitment. [Citations.] And the trial court had made no such finding." (*Kansas v. Crane*, *supra*, 534 U.S. 407, 411, italics added.)

In deeming this a misreading of *Hendricks*, *supra*, 521 U.S. 346, *Kansas v. Crane*, *supra*, 534 U.S. 407, did not directly confront the Kansas court's holding, contrary to *Hendricks*'s clear implication, that the Kansas statute could be applied constitutionally only if supplemented by special instructions on the issue of behavioral control. On the contrary, the *Kansas v. Crane* opinion *assumed the validity* of *Hendricks*'s core conclusion that, in this respect, the Kansas statute met constitutional requirements *as written*.

Thus, at the outset, *Kansas v. Crane, supra,* 534 U.S. 407, acknowledged that in *Hendricks, supra,* 521 U.S. 346, the court had upheld the Kansas statute against constitutional challenge. This, *Kansas v. Crane* noted, was because "the *statutory criterion* for confinement *embodied in the statute's words* 'mental abnormality or personality disorder' *satisfied* ' "substantive" due process requirements.' [Citation.]" (*Kansas v. Crane, supra,* at p. 409, italics added.)

As *Kansas v. Crane, supra,* 534 U.S. 407, further explained, *Hendricks* had found "that the Kansas 'Act *unambiguously* requires a finding of dangerousness either to one's self or to others,' [citation], and then 'links that finding to the existence of a "mental abnormality" or "personality disorder" *that makes it difficult, if not impossible, for the person to control his dangerous behavior*,' [citation]. And the Court [in *Hendricks*] ultimately determined that the statute's 'requirement of a "mental abnormality" or "personality disorder" is consistent with the requirement of . . . other statutes that we have upheld *in that it narrows the class of persons eligible for confinement to those who are unable to control their dangerousness*.' " (*Kansas v. Crane, supra,* at p. 410, italics added.)

*Kansas v. Crane, supra,* 534 U.S. 407, also reiterated why *Hendricks, supra,* 521 U.S. 346, had dismissed arguments that the Kansas statute's terms "mental abnormality" and "personality disorder" failed to describe a form of "mental illness" constitutionally necessary for civil commitment. In this regard, said *Kansas v. Crane,* "the Court [in *Hendricks*] pointed out that we 'have traditionally left to legislators the task of defining [such] terms.' [Citation.] [The *Hendricks* court] then held that, to 'the extent that the civil commitment statutes we have considered set forth criteria relating to an individual's inability to control his dangerousness, *the Kansas Act sets forth comparable criteria*.' [Citation.]" (*Kansas v. Crane, supra,* at p. 410, italics added.)

Nothing in *Kansas v. Crane, supra,* 534 U.S. 407, suggests that these clear earlier rulings were subject to fundamental review or revision. Instead, said the *Kansas v. Crane* court, the question now presented was simply whether "the Kansas Supreme Court [had] interpreted our decision in *Hendricks*[, *supra,* 521 U.S. 346] in an overly restrictive manner" (*Kansas v. Crane, supra,* at p. 409) by "requiring the State *always* to prove that a dangerous individual is *completely* unable to control his behavior" (*id.* at p. 411).

The court quickly dismissed such an interpretation of *Hendricks, supra,* 521 U.S. 346, holding that the earlier decision set forth "no requirement of *total* or *complete* lack of control." (*Kansas v. Crane, supra,* 534 U.S. 407, 411.) *Hendricks,* the court explained, "*referred to the Kansas Act as requiring*

a 'mental abnormality' or 'personality disorder' that makes it '*difficult*, if not impossible, for the [dangerous] person to control his dangerous behavior.' [Citation.] The word 'difficult' indicates that the lack of control to which this Court referred was not absolute." (*Kansas v. Crane, supra,* at p. 411, first italics added.) Such an extreme approach would be "unworkable," said the court, given the fine line between " 'an irresistible impulse and an impulse not resisted,' " and considering that "most severely ill people—even those commonly termed 'psychopaths'—retain some ability to control their behavior. [Citations.] [Thus,] [i]nsistence upon absolute lack of control would risk barring the civil commitment of highly dangerous persons suffering severe mental abnormalities." (*Id.* at pp. 411–412.)

On the other hand, the high court noted, the State of Kansas contended that "the Constitution permits commitment of the type of dangerous sexual offender considered in *Hendricks*[, *supra,* 521 U.S. 346] without *any* lack-of-control determination." (*Kansas v. Crane, supra,* 534 U.S. 407, 412.) If Kansas's argument was an invitation to the court to conclude, contrary to *Hendricks,* that impairment of control had *no relevance* to a constitutional civil commitment scheme, it did not succeed. The court declined to retreat from this portion of *Hendricks.*

As it had in *Hendricks, supra,* 521 U.S. 346, 360, the court indicated that if individuals could be civilly confined as dangerous without *any* disorder-related difficulty in controlling their dangerous behavior, there would be no adequate distinction from the general run of dangerous persons who are subject exclusively to the criminal law. (*Kansas v. Crane, supra,* 534 U.S. 407, 412.) Indeed, the court remarked, in *Hendricks* itself, the offender's diagnosed paraphilia, deemed a serious mental illness by the psychiatric profession, and his admitted inability to control his urges, ensured that the Kansas statute had been applied properly there. (*Kansas v. Crane, supra,* at pp. 410, 412–413.)

But the court made clear that the references in *Hendricks, supra,* 521 U.S. 346, to "lack of control" did not ascribe to that term "a particularly narrow or technical meaning. And we recognize that in cases where lack of control is at issue, 'inability to control behavior' will not be demonstrable with mathematical precision. It is enough to say that there must be proof of *serious difficulty* in controlling behavior." (*Kansas v. Crane, supra,* 534 U.S. 407, 413, italics added.)

The court acknowledged that this was not an exact standard, but asserted that constitutional safeguards are not always best enforced through rigid bright-line rules. In particular, the court explained, "the States retain considerable leeway in defining the mental abnormalities and personality disorders

that make an individual eligible for commitment. [Citation.]" (*Kansas v. Crane, supra*, 534 U.S. 407, 413.) Moreover, "the science of psychiatry, which informs but does not control ultimate legal determinations, is an ever-advancing science, whose distinctions do not seek precisely to mirror those of the law. [Citations.] Consequently, we have sought to provide constitutional guidance in this area by proceeding *deliberately and contextually*, elaborating generally stated constitutional standards and objectives as specific circumstances require. *Hendricks*[, *supra*, 521 U.S. 346] embodied that approach." (*Kansas v. Crane, supra*, 534 U.S. at pp. 413–414, italics added.)

The State of Kansas also argued that its high court should not have interpreted *Hendricks, supra*, 521 U.S. 346, to "absolutely forbid[]" the commitment of dangerous persons who suffer only "emotional," but not "volitional" impairments. The United States Supreme Court agreed that *Hendricks, supra*, 521 U.S. 346, had not discussed emotional impairments, since the disorder at issue there was not of that kind. (*Kansas v. Crane, supra*, 534 U.S. 407, 414–415.) The court noted that "we likewise have no occasion" in Crane's case to "consider whether confinement based solely on 'emotional' abnormality would be constitutional." (*Ibid.*) However, the court indicated its reluctance to eliminate primarily emotional difficulties as a basis for the commitment of dangerously disordered persons. It said that "[h]ere, as in other areas of psychiatry, there may be 'considerable overlap between a . . . defective understanding or appreciation and . . . [an] inability to control . . . behavior.' [Citation.] Nor, when considering civil commitment, have we ordinarily distinguished for constitutional purposes among volitional, emotional, and cognitive impairments. [Citations.]" (*Ibid.*)

As its disposition, the court simply vacated the Kansas Supreme Court's judgment and "remanded [the case] for further proceedings not inconsistent with this opinion." (*Kansas v. Crane, supra*, 534 U.S. 407, 415.)

Thus, in essence, *Kansas v. Crane, supra*, 534 U.S. 407, (1) confirmed the principle of *Hendricks, supra*, 521 U.S. 346, that a constitutional civil commitment scheme must link future dangerousness to a mental abnormality that impairs behavioral control, while (2) making clear that the impairment need only be serious, not absolute. *Kansas v. Crane* reiterated *Hendricks*'s holding that within wide boundaries, state legislators may define this difficult-to-articulate concept as they wish, and acknowledged *Hendricks*'s earlier conclusion that the Kansas statute articulated it sufficiently.

Nowhere did *Kansas v. Crane, supra*, 534 U.S. 407, suggest that the Kansas law so recently upheld *as written* in *Hendricks* could be constitutionally applied only with supplemental instructions, in language *not* chosen by

Kansas's legislators, pinpointing the impairment-of-control issue. Though the high court rejected the State of Kansas's argument that *no* impairment-of-control "determination" was required (*Kansas v. Crane* at p. 412), this language, read in context, appears intended only to verify that a constitutional civil confinement scheme cannot *dispense* with impaired behavioral control as a basis for commitment.

As we made clear in *Hubbart, supra*, 19 Cal.4th 1138, California's SVPA, like the Kansas statute at issue in *Hendricks, supra*, 521 U.S. 346, and *Kansas v. Crane, supra*, 534 U.S. 407, does *not* dispense with that requirement. On the contrary, California's statute inherently *embraces and conveys* the need for a dangerous mental condition characterized by impairment of behavioral control. As we have seen, the SVPA accomplishes this purpose by defining a sexually violent predator to include the requirement of a diagnosed mental disorder (§ 6600, subd. (a)(1)) affecting the emotional or volitional capacity (*id.*, subd. (c)), which predisposes one to commit criminal sexual acts so as to render the person a menace to the health and safety of others (*ibid.*), such that the person is "likely [to] engage in sexually violent criminal behavior" (*id.*, subd. (a)(1)). (*Hubbart, supra*, at pp. 1152–1161.)

Indeed, in contrast with the Kansas statute, California's SVPA states *no* category of committable disorder which *does not expressly require* a dangerous effect on emotional or volitional capacity. We are persuaded that a jury instructed in the language of California's statute must necessarily understand the need for serious difficulty in controlling behavior.[6]

In our view, a judicially imposed requirement of special instructions *augmenting* the clear language of the SVPA would contravene the premise of both *Hendricks, supra*, 521 U.S. 346, and *Kansas v. Crane, supra*, 534 U.S. 407, that, in this nuanced area, the *Legislature* is the primary arbiter of how the necessary mental-disorder component of its civil commitment scheme shall be defined and described. (See *Kansas v. Crane, supra*, at pp. 410, 413; *Hendricks, supra*, at p. 359.) No reason appears to interfere with that legislative prerogative here.

Accordingly, we conclude, *Kansas v. Crane, supra*, 534 U.S. 407, does not compel us to hold that further lack-of-control instructions or findings are

---

[6] Parsing the statutory language closely, defendant urges that the SVPA's definition of a "diagnosed mental disorder" purports to require only an "[e]ffect[]" on emotional or volitional capacity (§ 6600, subd. (c)), without stating the necessary *serious degree* of this "[e]ffect[]." But insofar as the SVPA specifies that the diagnosed mental disorder must so "predispose[]" the person to the commission of criminal sexual acts as to "constitute a menace to the health and safety of others" (*ibid.*), it clearly conveys that concept.

necessary to support a commitment under the SVPA.[7] For the reasons we have detailed, we decline to do so.

In other states, courts have divided when considering the effect of *Kansas v. Crane, supra,* 534 U.S. 407, on similarly worded schemes for the commitment of dangerously disordered sex offenders. The more persuasive decisions have determined, as we do, that the pertinent statutory language—language sometimes less explicit than California's on the impairment-of-control issue—adequately conveys *Kansas v. Crane*'s requirements, and that commitments under the statutes at issue are thus constitutionally valid without the need for additional instructions or specific findings on impairment of control.[8]

Certain out-of-state cases, when concluding that their statutory language satisfied *Kansas v. Crane, supra,* 534 U.S. 407, relied in part on the fact that their statutes, either explicitly or by judicial construction, allowed commitment only if it was *more likely than not* that the person would reoffend if

---

[7] In his dissenting opinion in *Kansas v. Crane, supra,* 534 U.S. 407, Justice Scalia accused the majority of requiring a separate *finding* of lack of control (*id.* at p. 419 (dis. opn. of Scalia, J.)), and of thus holding, contrary to *Hendricks, supra,* 521 U.S. 346, "that the Kansas Sexually Violent Predator Act . . . cannot, consistent with so-called substantive due process, be applied as written" (534 U.S. at p. 415 (dis. opn. of Scalia, J.)). For the reasons described above, we respectfully disagree with Justice Scalia's assessment of the *Kansas v. Crane* majority's ruling.

[8] (*Westerheide v. State* (Fla. 2002) 831 So.2d 93, 105–109; *People v. Swanson* (2002) 335 Ill.App.3d 117 [780 N.E.2d 342, 347–348, 269 Ill.Dec. 157]; *In re Detention of Isbell* (2002) 333 Ill.App.3d 906 [777 N.E.2d 994, 998–999, 268 Ill.Dec. 71]; *In re Treatment and Care of Luckabaugh* (2002) 351 S.C. 122 [568 S.E.2d 338, 348–349] [statute does not mention impairment of emotional or volitional capacity]; *In re Commitment of Laxton* (2002) 2002 WI 82 [254 Wis.2d 185, 647 N.W.2d 784, 793–794], cert. den. (2003) 537 U.S. 1114 [123 S.Ct. 870]; see *In re Dutil* (2002) 437 Mass. 9 [768 N.E.2d 1055, 1059, 1063–1064] [statute expressly requires future dangerousness as result of demonstrated lack of power to control sexual impulses, but does not expressly require mental illness]; but see *In re Leon G.* (2002) 204 Ariz. 15 [59 P.3d 779, 781–789] [due process *does not require* specific impairment-of-control instructions, but courts are directed to provide such instructions as matter of Arizona practice]; *In re Detention of Barnes* (Iowa 2003) 658 N.W.2d 98, 101 [under *Kansas v. Crane,* instructions must specifically define requisite mental abnormality as creating "serious difficulty" in behavioral control]; *In re Martinelli* (Minn.Ct.App. 2002) 649 N.W.2d 886, 889–890 [Minnesota Supreme Court had previously found, under *Hendricks, supra,* 521 U.S. 346, that judicial finding of "lack of control" is required; "lack of control" standard then adopted for Minnesota cases remains adequate under *Kansas v. Crane, supra,* 534 U.S. 407]; *Thomas v. State* (Mo. 2002) 74 S.W.3d 789, 790–792 [under *Kansas v. Crane,* instructions must specifically define requisite mental abnormality as creating "serious difficulty" in behavioral control]; *In re Commitment of W.Z.* (2002) 173 N.J. 109 [801 A.2d 205, 215–217, 219] [New Jersey statute upheld under *Kansas v. Crane,* but case remanded for further findings re "serious difficulty" in controlling behavior, on grounds that requisite standard had not been articulated by federal or state courts at time of trial]; *Spink v. State* (2002) 112 Wn.App. 287 [48 P.3d 381, 382] [commitment of sexually violent predator reversed for failure to include specific impairment-of-control instruction].)

free.[9] On the other hand, we have interpreted the "likely to reoffend" prong of California's SVPA[10] to require only " 'a *substantial danger*, that is, a *serious and well-founded risk*' "—but not necessarily a greater than even chance—that the person's diagnosed mental disorder will lead to new criminal sexual violence unless the person is confined and treated. (*People v. Roberge* (2003) 29 Cal.4th 979, 988 [129 Cal.Rptr.2d 861, 62 P.3d 97] (*Roberge*), quoting *People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888, 922 [119 Cal.Rptr.2d 1, 44 P.3d 949] (*Ghilotti*); see also *Cooley v. Superior Court* (2003) 29 Cal.4th 228, 255 [127 Cal.Rptr.2d 177, 57 P.3d 654] (*Cooley*).)

This difference does not persuade us that specific impairment-of-control instructions are constitutionally required in California. As we have indicated, the "mental disorder" prong of the SVPA—at issue here pursuant to *Kansas v. Crane, supra,* 534 U.S. 407—is distinct from the prong addressing the *degree of future dangerousness*, which was before us in *Roberge, supra,* 29 Cal.4th 979, *Cooley, supra,* 29 Cal.4th 228, and *Ghilotti, supra,* 27 Cal.4th 888. (See *Ghilotti, supra,* at p. 921, fn. 12.) Entirely aside from future dangerousness, the SVPA requires a diagnosed mental disorder *affecting the person's emotional or volitional capacity* that predisposes the person to commit sex crimes in a menacing degree. (§ 6600, subd. (c).) We intimated in *Ghilotti, supra,* 27 Cal.4th 888, 921, footnote 12, and confirm here, that this requirement alone implies "serious difficulty" in controlling behavior, as required by *Kansas v. Crane.*

A mental disorder that includes all the above-described elements—including a dangerous impairment of capacity—must additionally produce an actual risk of violent reoffense which, under all the applicable circumstances, is "substantial," "serious," and "well-founded." (*Roberge, supra,* 29 Cal.4th 979, 988; see *Ghilotti, supra,* 27 Cal.4th at p. 921, fn. 12.) Jurors instructed in these terms must necessarily understand that one is not eligible for commitment under the SVPA unless his or her capacity or ability to control

[9] (See, e.g., *In re Leon G., supra,* 59 P.3d 779, 786–788 [construing Arizona requirement of mental disorder making the person "likely" to engage in acts of sexual violence as requiring "high[] probab[ility]" of reoffense]; *In re Commitment of Laxton, supra,* 647 N.W.2d 784, 793–794 [Wisconsin statute requiring "substantial[] probab[ility]" of reoffense means that recidivism must be "more likely than not"]; see also *Westerheide v. State, supra,* 831 So.2d 93, 106 [noting that "likely," as used in Florida statutory phrase "likely to engage in acts of sexual violence," has been construed to mean "highly probable or probable and having a better chance of existing or occurring than not"].)

[10] As we have explained, under our statute, a sexually violent predator must have a "diagnosed mental disorder" (§ 6600, subd. (a)(1)) "affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others" (*id.,* subd. (c)), and which "makes the person a danger to the health and safety of others in that it is *likely* that he or she will engage in sexually violent criminal behavior" (*id.,* subd. (a)(1), italics added).

violent criminal sexual behavior is seriously and dangerously impaired. No additional instructions or findings are necessary.[11]

Finally, we are influenced in our interpretation of *Kansas v. Crane, supra*, 534 U.S. 407, by the South Carolina Supreme Court's observation in *In re Treatment and Care of Luckabaugh, supra*, 568 S.E.2d 338. Noting that 16 states then had commitment statutes for violent, dangerously disordered sex offenders (see *id.* at p. 348, fn. 8), the *Luckabaugh* court reasoned that "[t]o read [*Kansas v.*] *Crane* as requiring a special finding [of serious difficulty in controlling behavior] would be to suggest that the United States Supreme Court mandated at least sixteen states to hold new commitment hearings for over 1,200 individuals [currently] committed under their [states'] sexually violent predator acts. [Citation.] We believe the Court's ruling would have been more explicit if it intended such consequences." (*Luckabaugh*, 568 S.E.2d at p. 348, fn. omitted.)[12]

For all the reasons indicated, we conclude that a commitment rendered under the plain language of the SVPA necessarily encompasses a determination of serious difficulty in controlling one's criminal sexual violence, as required by *Kansas v. Crane, supra*, 534 U.S. 407. Accordingly, separate instructions or findings on that issue are not constitutionally required,[13] and no error arose from the court's failure to give such instructions in defendant's trial.[14]

---

[11] Defendant's trial occurred in 2001, before *Ghilotti, supra*, 27 Cal.4th 888, and *Roberge, supra*, 29 Cal.4th 979, defined the "likely to reoffend" prong of the SVPA to require only a substantial, serious, and well-founded risk of reoffense. But there is no reasonable chance that jurors instructed without the *Roberge-Ghilotti* clarification would thereby assume that a serious difficulty in controlling behavior was *not* required. Certainly defendant has no complaint, on the facts of this case, that the jury found him to be a sexually violent predator even though it did not believe he had such serious difficulty. (See discussion *post*; cf. *Roberge, supra*, at p. 989.)

[12] In a footnote, the majority cited commitment statistics provided in the amicus curiae brief filed by Illinois and other states. These statistics indicated, inter alia, that as of the decision in *Kansas v. Crane, supra*, 534 U.S. 407, some 270 individuals were under SVPA commitments in California. (*In re Treatment and Care of Luckabaugh, supra*, 568 S.E.2d 338, 348, fn. 9.)

[13] On appeal, defendant has not articulated whether his due process arguments are premised on *both* the federal *and* California Constitutions; of course, he relies primarily on a United States Supreme Court decision construing the federal charter. To the extent defendant seeks to rely on parallel provisions of the state Constitution, no reason appears to reach a different result. (See *Hubbart, supra*, 19 Cal.4th 1138, 1152, fn. 19.)

[14] Defendant urges that a specific "control" instruction was "upheld" in *People v. Ward* (1999) 71 Cal.App.4th 368 [83 Cal.Rptr.2d 828], a case that predates *Kansas v. Crane, supra*, 534 U.S. 407. But defendant misreads *Ward*. The Court of Appeal simply noted that such an instruction was *given* in that case, and that *additional* instructions requested by the defendant were thus not necessary. (*Ward, supra*, at p. 375.) *Ward* neither stated nor implied that a specific instruction on impairment of control is constitutionally *required*.

Insofar as *Kansas v. Crane, supra,* 534 U.S. 407, held that one may not be civilly committed absent some specific *"proof* of serious difficulty in controlling [dangerous] behavior" *(id.* at p. 413, italics added), ample evidence to that effect was presented here. Both expert witnesses testified that defendant suffers from paraphilia, a serious, incurable mental disorder, which is characterized by the obsessive, repetitive, and driven nature of his criminal sexual violence. (See *id.* at pp. 412, 414–415.) The experts indicated that defendant continued to exhibit a marked lack of control over his sexual behavior, as evidenced by his many acts of indecent exposure and public masturbation while confined as a result of his violent sex offenses.

There was expert testimony that defendant's control is further impaired by other mental disorders, such as psychosis, paranoia, and severe antisocial personality disorder, which enhance his impulsivity and cloud his judgment. According to one of the testifying psychologists, defendant frankly admitted that he lacked control over his pathological sexual behavior. Defendant offered no contrary evidence. Hence, defendant was clearly established as " 'a dangerous sexual offender [of the kind] subject to civil commitment [as distinguished] "from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings." ' " (*Kansas v. Crane, supra,* 534 U.S. 407, 412, quoting *Hendricks, supra,* 521 U.S. 346, 360.)

For similar reasons, we also agree with the Court of Appeal that if instructional error had occurred under *Kansas v. Crane, supra,* 534 U.S. 407, it was harmless beyond a reasonable doubt. (*People v. Hurtado* (2002) 28 Cal.4th 1179, 1194 [124 Cal.Rptr.2d 186, 52 P.3d 116].) Because it was essentially undisputed that defendant's diagnosed mental disorder involved serious difficulty in controlling sexual behavior, the absence of an instruction pinpointing that issue must "beyond a reasonable doubt . . . have made no difference in reaching the verdict obtained." (*Yates v. Evatt* (1991) 500 U.S. 391, 407 [114 L.Ed.2d 432, 111 S.Ct. 1884].)

The judgment of the Court of Appeal is affirmed.

George, C. J., Werdegar, J., Chin, J., Brown, J., and Moreno, J., concurred.

**KENNARD, J.,** Concurring.—In *Kansas v. Crane* (2002) 534 U.S. 407 [151 L.Ed.2d 856, 122 S.Ct. 867], the United States Supreme Court said that a defendant can be confined as a dangerous sexual predator only upon proof of "serious difficulty in controlling behavior." (*Id.* at p. 413.) California's Sexually Violent Predators Act (SVPA) (Welf. & Inst. Code, § 6600 et seq.), enacted before *Crane* was filed, applies to a person who has a "diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent

criminal behavior." (*Id.*, § 6600, subd. (a)(1).) A "diagnosed mental disorder" is defined to include a condition "affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others." (*Id.*, § 6600, subd. (c).) The SVPA is not expressly limited to defendants who have serious difficulty in controlling their behavior.

Taking the language of the SVPA literally, a person could be confined as a sexually violent predator based on a condition that affects his emotional capacity by making the person likely to engage in sexually violent criminal behavior, even if he does not have serious difficulty in controlling his behavior. In other words, California's SVPA applies literally to persons who have the capacity to refrain from committing predatory acts but choose to commit them anyway. Even though such persons are a danger to the health and safety of others, under *Kansas v. Crane, supra,* 534 U.S. 407, they cannot be confined under the SVPA procedure.

The majority in this case, however, points out the impossibility of distinguishing between the effects of mental illness on emotional capacity and volitional capacity. (Maj. opn., *ante,* at pp. 762–763.) After thorough review of the precedents from the United States Supreme Court and this court, it concludes that "California's statute inherently *embraces and conveys* the need for a dangerous mental condition characterized by impairment of behavioral control." (*Id.* at p. 774.) And because the SVPA specifies that the defendant's mental disorder must predispose the person to the commission of criminal sexual acts to such an extent that he becomes "a menace to the health and safety of others" (Welf. & Inst. Code, § 6600, subd. (c)), the majority reasons that a defendant's difficulty in controlling behavior must be serious. I agree with this construction of the SVPA.

But the jurors in an SVPA case, if instructed solely in the language of the SVPA, will know nothing of the majority's sophisticated exercise in statutory construction, of the precedents on which it based its holding, or the implications and conclusions it draws. The jurors may apply the literal language of the statute and find a defendant to be a sexually violent predator without deciding whether the defendant has serious difficulty in controlling his behavior. The jurors would not be acting unreasonably in reaching such a result; as the majority points out, state appellate courts are closely divided on whether statutory language similar to California's SVPA does or does not include an implied requirement that the defendant have serious difficulty in controlling behavior. (See maj. opn., *ante,* at p. 774 & fn. 6.)

A recent Arizona Supreme Court decision addressed this problem. After holding that due process requirements do not require a jury instruction on

serious difficulty in controlling behavior, the court went on to say: "Given the important interests involved in SVP proceedings for both the state and the individual, no question should arise as to whether the jury understands the importance of finding that a mental disorder, rather than a voluntary decision to engage in repetitive criminal behavior, renders a person dangerous within the meaning of the SVP statute. To assure that jurors understand this requirement, we direct trial judges to instruct juries as follows in future SVP proceedings: . . . An individual's dangerousness must be caused by a mental disorder which, in turn, causes the person to have serious difficulty in controlling his or her behavior." (*In re Leon G.* (2002) 204 Ariz. 15 [59 P.3d 779, 788].)

It would be prudent for California trial courts also to explain to jurors in future cases that defendants cannot be found to be sexually violent predators unless they have serious difficulty in controlling their behavior. Such an instruction will ensure that jurors comply with *Kansas v. Crane, supra,* 534 U.S. 407, 413, and do not commit defendants as sexually violent predators without determining that the defendants have serious difficulty in controlling their behavior. There is a risk that the United States Supreme Court, resolving the conflict in state court decisions noted by the majority (maj. opn., *ante*, at p. 777), may hold that a jury instruction on controlling behavior is constitutionally required; by anticipating this possibility and mandating such an instruction under our judicial authority, we can ensure the validity of California SVPA commitments.